[No. 21943–0–I.   Division One.   December 11, 1989.]

THE STATE OF WASHINGTON, *Respondent,* v. MANUEL
BAUTISTA–CALDERA, *Appellant.*

*Dennis A. Benjamin,* for appellant.

*David L. McEachran, Prosecuting Attorney,* and *Daniel Gibson, Deputy,* for respondent.

SWANSON, J.—Manuel Bautista-Caldera (Bautista) appeals from the judgment and sentence entered following his conviction on two counts of first degree statutory rape and one count of indecent liberties. Bautista contends that he was denied his right to a unanimous jury verdict and that the deputy prosecutor committed prejudicial misconduct during closing argument.

Bautista was charged with three counts of first degree statutory rape. Counts 1 and 2 alleged incidents in identical language for the period August 1, 1986, to January 1, 1987 (first charging period); count 3 alleged an incident occurring between July 20, 1987, and August 1, 1987 (second charging period). The complaining witness was R, who was 9 years old at the time of trial.

During the first charging period, from August 1, 1986, to January 1, 1987, R lived with her mother and the defendant in a 1-bedroom apartment on Maplewood Street in Bellingham. During the second charging period, from July 20, 1987, to August 1, 1987, the three lived in a 2-bedroom apartment on Alderwood Street in Bellingham.

Following a pretrial hearing, the trial court found R competent to testify. Pursuant to RCW 9A.44.120, the child victim hearsay statute, the trial court also ruled admissible various accounts of the charged incidents that R gave to other persons.

At trial, R testified that when she was living in the apartment on Maplewood Street, the defendant "touched me in my private spot." R explained that the Maplewood apartment had one bedroom; she slept in one bed and her mother and the defendant slept in the other. One morning after her mother left for work, the defendant called R over to his bed. R came over and got into bed with the defendant. The defendant then "put his hand down my panties

[and] [s]tuck his finger up my private spot . . . just stuck it up." R said that Bautista's actions "hurt" and that the defendant threatened to spank her with his black belt if she told anyone. On the same morning, Bautista also "took my hand and stuck it down his pants" and touched "his private spot." According to R, Bautista did not do "that" again while she was living at the Maplewood address.

R then testified about an incident that occurred after she had moved from the Maplewood apartment to the 2–bedroom apartment on Alderwood Street. R recalled this incident as having occurred in the summer of 1987, when she had chicken pox and her mother was in the hospital having a baby. R testified that Bautista rubbed lotion over her and touched her "private spot." R stated that the touching was "like the time before" and that Bautista put his finger inside her.

While asking R about the second charging period, the deputy prosecutor interrupted his line of questioning and asked whether she recalled Bautista putting Mentholatum on her. R indicated that she did and that this had occurred at "[t]he time that you just told the jury about," *i.e.,* the incident during the first charging period at the Maplewood apartment. R stated that Bautista put the Mentholatum on her chest and on her "private spot" and that "that" had occurred more than once.

Susie B., R's mother, testified that while living at the Maplewood apartment, she was present when Bautista applied Mentholatum to R's neck, chest, and feet. Susie also stated that R had sores on her vaginal area from the chicken pox and that Bautista had told her that he had applied lotion while she was in the hospital having a baby. Susie felt this was "appropriate" to the extent the lotion had been applied to non–sexual areas of R's body.

Dr. Mary Ellen Shields, a pediatrician, examined R on September 17, 1987. During the interview, R described the touching as "He stuck [his finger] up my poopie and my private spot." R also told Shields that Bautista had made

her "rub his penis." Shields's physical examination of R was inconclusive. During cross examination, Shields stated that Mentholatum, if applied to sexual organs, would probably "sting badly."

Several other witnesses related what R had told them about the touching that occurred during the first charging period. None of the witnesses, however, provided any specific details beyond those that R herself described.

Detective Carlotta Jarratt, the investigating officer, interviewed R on August 21, 1987. R told Jarratt that Bautista had "poked his pointy finger inside" her private spot. R also described how Bautista took her hand, placed it on his penis, and "told me to move my hand up and down." R said that "this" had happened twice—"after school started in 1986 when she was in the second grade [and] before Christmas, *i.e.,* during the first charging period. At a subsequent interview, R told Jarratt that Bautista had rubbed lotion on the "inside" of her private parts when she had chicken pox.

Jarratt also interviewed Bautista on August 21, 1987. After being advised of his rights, Bautista told Jarratt that he had rubbed medicine on R, including on her private parts on three occasions. One occasion was 3 weeks prior to the interview, when R had chicken pox. Bautista also acknowledged having rubbed "[R] down between her legs and breasts and all her body with Mentholatum two times last winter when she had a cold . . ." Bautista denied having inserted his finger into R's vagina. Bautista stated that he had once asked R to crawl into bed with him when the apartment was cold. Following the interview, Bautista signed a written statement. In the statement, admitted at trial, Bautista described the Mentholatum incident as follows:

> Two times I rubbed her down all over with Mentholatum when she had a cough in the wintertime. I rubbed her private parts, potty and breasts with Mentholatum but I did not poke my finger inside.

Bautista testified in his own defense, denying that he ever inserted his finger into R's vagina. Bautista acknowledged that he had applied lotion to R's entire body, including her private parts, on two consecutive days when R had chicken pox in July 1987. Bautista also stated that he had rubbed Mentholatum on R's chest and feet when she had a cold. Bautista insisted, however, that he had applied the Mentholatum in the presence of R's mother. Bautista attributed the discrepancy between the statement and his testimony to a misunderstanding.

The jury found Bautista guilty of first degree statutory rape as charged in counts 1 and 3; Bautista was found guilty of the lesser included offense of indecent liberties in connection with count 2.

█ Bautista first contends that his right to a unanimous verdict was violated. We agree.

[A] defendant may be convicted only when a unanimous jury concludes that the criminal act charged in the information has been committed. When the prosecution presents evidence of several acts that could form the basis of one count charged, either the State must tell the jury which act to rely on in its deliberations or the court must instruct the jury to agree on a specific criminal act.

(Citation omitted.) *State v. Kitchen,* 110 Wn.2d 403, 409, 756 P.2d 105 (1988); *see also State v. Petrich,* 101 Wn.2d 566, 683 P.2d 173 (1984). The failure to adopt one of these alternatives violates the defendant's state constitutional right to a unanimous jury verdict and federal constitutional right to a jury trial. *Kitchen.*

The error arises from the possibility that "some jurors may have relied on one act or incident and some another, resulting in a lack of unanimity on all of the elements necessary for a valid conviction." *Kitchen,* at 411. An error under these circumstances is not harmless "if a rational trier of fact could have a reasonable doubt as to whether each incident established the crime beyond a reasonable doubt." *Kitchen,* at 411 (quoting *State v. Loehner,* 42 Wn. App. 408, 411, 711 P.2d 377 (1985) (Scholfield, A.C.J., concurring), *review denied,* 105 Wn.2d 1011 (1986)).

The State maintains that the failure to give a unanimity instruction here was harmless error, relying on the analysis of *State v. Loehner, supra.* In *Loehner,* the defendant was charged with one count of statutory rape. At trial, the victim described one incident in detail and described additional incidents as "he did the same thing [and] same stuff." *Loehner,* at 410. In analyzing the trial court's failure to instruct on unanimity, this court reasoned:

> if the jury believed the evidence of the first rape, *no rational trier of fact could have entertained a reasonable doubt as to the later ones* because those were dependent upon the description of the first one. If the rational trier of fact entertained a reasonable doubt as to the episode described in detail, of necessity the rational trier of fact would have a reasonable doubt as to the subsequent ones, also.

(Italics ours.) *Loehner,* at 410.

This court recently employed a similar approach in *State v. Camarillo,* 54 Wn. App. 821, 776 P.2d 176, *review granted,* 113 Wn.2d 1023 (1989). In *Camarillo* the defendant was charged with one count of indecent liberties; at trial, the victim described three separate incidents of abuse. The defendant took the stand and denied the accusations, but offered no contravening evidence. Relying on *Loehner,* we concluded that the failure to give a unanimity instruction was harmless error:

> Because proof of the substantially similar incidents relied upon a single witness' detailed, uncontroverted testimony, and because Camarillo offered no evidence upon which the jury could discriminate between the incidents, a rational juror believing one of the incidents actually occurred would necessarily believe that the others occurred as well.

*Camarillo,* at 828–29.

Unlike *Loehner* and *Camarillo,* the instant case involves not only evidence of multiple incidents but also multiple charges, a factor that complicates harmless error analysis. The State alleged that Bautista committed two acts of first degree statutory rape (counts 1 and 2) during the first charging period. R described in detail one act of penetration and one act of sexual touching that occurred at the Maplewood apartment during the first charging period. To

establish two acts of penetration, the State appears to have relied primarily on the testimony of Detective Jarratt, who related that R told her about one incident of penetration and touching in detail and then said the "same things" had occurred twice while she was living at the Maplewood apartment. In order to reach the verdict that it did on counts 1 and 2, however, the jury rejected the evidence suggesting that two acts of penetration occurred during the first charging period.

The State's argument also ignores the substantial evidence regarding Bautista's application of Mentholatum on R's body. The deputy prosecutor interrupted his questioning about the second charging period to ask R whether she recalled Bautista rubbing Mentholatum on her during the first charging period. R then stated that Bautista has rubbed Mentholatum on her chest and "private parts" on more than one occasion. The State, during various stages of the case, stressed the discrepancy between Bautista's written statement, in which he stated that he had twice rubbed R's "private parts, potty and breasts with Mentholatum" when she had a "cold in the wintertime," and Bautista's testimony, in which he denied telling Detective Jarratt that he rubbed Mentholatum on R's private parts.

Also unlike *Loehner* and *Camarillo,* the evidence of multiple acts in the instant case was not based solely on the undifferentiated or uncontroverted testimony of a single witness. Given the differing accounts that R gave to various persons about sexual touching and the conflicting evidence on the subject of Mentholatum, a rational juror could have entertained reasonable doubts about several of the incidents as a basis for the convictions. We are not persuaded by the State's attempt, through a complicated and highly speculative process of elimination, to identify those acts that the jury probably relied upon. Consequently, the trial court's failure to give a unanimity instruction or to require election as to counts 1 and 2 was not harmless error. *Cf. State v. Handyside,* 42 Wn. App. 412, 416, 711 P.2d 379 (1985) (failure to instruct on unanimity not harmless where

there was "no basis in the evidence for concluding . . . that a rational juror could not have had reasonable doubts about the adequacy of the proof in support of one or more of the three incidents.").[1]

The trial court's failure to instruct on unanimity or to require election in connection with the second charging period, however, was harmless error. R described only one act of penetration that occurred while Bautista was rubbing her with lotion in July 1987. The only evidence of multiple incidents during this charging period was Bautista's own testimony acknowledging that he rubbed the lotion on R, including on her "private spot," on two consecutive days in July. Because there was no conceivable way to distinguish the two occurrences described by Bautista, the jury, in order to convict him of first degree statutory rape, must have unanimously believed R's account.

■ Bautista next contends that prosecutorial misconduct during closing argument denied him a fair trial. In determining whether prosecutorial comments have denied the defendant a fair trial, a reviewing court must decide whether the comments are improper and, if so, whether there is a substantial likelihood that the comments affected the verdict. *State v. Reed,* 102 Wn.2d 140, 145, 684 P.2d 699 (1984). A failure to object to an improper remark constitutes a waiver unless the comment is flagrant and ill intentioned and the resulting prejudice so enduring that jury admonitions could not neutralize its effect. *State v. Charlton,* 90 Wn.2d 657, 661, 585 P.2d 142 (1978). In the instant case, defense counsel, who objected vigorously throughout the trial, raised no objection to the comments now challenged on appeal.

Bautista first challenges the following comments:

[R] is the classic in terms of the type of person that someone like Bautista will molest. Precisely because she's who she is. And so when the defense gets up here and starts working over

[1]Because we reverse the convictions on counts 1 and 2, we need not address the sentencing issue touched upon by the parties.

[R]'s case, I want you to remember that. I want you to remember that her client, Manuel Bautista, [chose] well when he [chose] his victim and I urge [you] not to reward his choice of victims by saying, well, she's a little girl, she was confused.

. . . .

I suspect the defense would like you to concentrate on the testimony of [R] because it's easier to take advantage of nine year olds than others because of their vulnerability.

Bautista contends that these comments constituted an improper attack on the defense counsel, referred to matters not in evidence, and revealed a personal belief in the defendant's guilt.

No evidence was presented regarding the "type of person" that "someone like Bautista will molest." However, the challenged remarks are part of a long closing argument directed primarily to the issue of R's performance on the witness stand, in which the prosecutor attempted to explain and analyze the occasionally inconsistent testimony and demeanor of the 9–year–old witness. Viewed in the context of the closing argument as a whole, we do not find the comments so flagrant or ill intentioned or to engender such prejudice that a timely objection and curative instruction could not have neutralized any potentially harmful effects.

More questionable, however, are the emphasized portions of the prosecutor's comments during rebuttal closing argument:

Also, as you think about this evidence, I urge you to be especially careful in considering, looking at it for if you're inclined to throw up your hands quickly and say I just don't know what happened, think further, look further, look more closely. Because that's precisely what Manuel Bautista–Caldera wants you to do.

Think of [R], *think of all the children who do not talk that well* who unfortunately don't remember everything in precise order in which it happens but whose only hope is people like yourself who are willing to take this case seriously, understand why it is that this happened.

Think about [R]. Can you look at her and say, "[R], I don't believe you." Can you listen to this testimony and you look at all the evidence, there's one conclusion in this case, she was molested. This touching of her was not as innocent as he claims. He did it for his sexual gratification however perverted

that was. He had no reason to fondle the child. Even if he had the briefest of relationships.

Should for some reason you not be satisfied that he penetrated her, although I think that is clear from her testimony and from the definition that you're given, certainly, ladies and gentlemen, *do not tell that child that this type of touching is okay, that this is just something that she will have to learn to live with. Let her and children know that you're ready to believe them and [e]nforce the law on their behalf.* Thank you.

Here, the prosecutor asks the jury, if it has doubts that penetration occurred, to convict on the lesser included offense. This plea is not based solely on the evidence, however, but in effect exhorts the jury to send a message to *society* about the general problem of child sexual abuse. Such an emotional appeal is improper, as the State essentially concedes. *Cf. State v. Belgarde,* 110 Wn.2d 504, 755 P.2d 174 (1988).

The argument preceding the improper remarks, however, correctly urged the jury to reach its decision based on the evidence presented. Moreover, the improper comments are not nearly so extensive or egregious as those found to constitute reversible misconduct in *State v. Belgarde, supra,* or *State v. Reed, supra.* We do not find any prejudice to be such as could not have been neutralized with a curative instruction.

Appellant equates the misconduct here to that in *State v. Claflin,* 38 Wn. App. 847, 690 P.2d 1186 (1984), *review denied,* 103 Wn.2d 1014 (1985), in which the prosecutor read a poem during closing argument by an anonymous rape victim to show what one of the defendant's alleged victims "probably felt." This court found that the reading of the poem was so prejudicial that no curative instruction could have neutralized the harm. The poem at issue in *Claflin* was long, referred to matters outside the record, and contained "vivid and highly inflammatory imagery in describing rape's emotional effect on its victims . . ." *Claflin,* at 850. In comparison, the improper comments here were not nearly so egregious.

In summary, Bautista's convictions on counts 1 and 2 are reversed; the conviction on count 3 is affirmed.

SCHOLFIELD and WINSOR, JJ., concur.

Reconsideration denied January 18, 1990.

Review denied at 114 Wn.2d 1011 (1990).