2016 MAY 23  AM II: 13


# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 72829-6-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| JAMES ALAN DELONG | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: May 23, 2016 |
| | ) | |

LAU, J. — James DeLong appeals his convictions on one count of second degree rape, one count of first degree promoting prostitution, one count of second degree promoting prostitution, and one count of second degree theft. He contends the trial court erred when it concluded that the rape shield statute prohibited evidence of the victim's contemporaneous sexual relationship with her boyfriend. DeLong claims this evidence was relevant to show the victim possessed the mental capacity to consent to sex. He argues excluding this evidence violated his Sixth Amendment right to present a defense. DeLong also claims that the prosecutor's statements during closing argument amounted to misconduct and that defense counsel was constitutionally ineffective for failing to object to these statements. We conclude the trial court properly excluded

evidence of the victim's alleged sexual relationship with her boyfriend as more prejudicial than probative and that this did not deprive DeLong of his constitutional right to present a defense. Even if we assume, without deciding, that the prosecutor's statements were improper, Delong fails to show incurable prejudice. For similar reasons, defense counsel's failure to object was not deficient. And DeLong cannot show that the outcome would have been different but for defense counsel's failure. We affirm the judgment and sentence.

## FACTS

For a four to five month period during 2013-14, Christina Stark lived with James DeLong and P.W. in a Federal Way residence. Stark testified that P.W., age 51, exhibited a diminished mental capacity. For example, Stark explained that P.W. had many child-like tendencies—she enjoyed watching cartoons, especially Scooby Doo, she had a large collection of toys and dolls, and she referred to Stark as "mom." Report of Proceedings (RP) (Nov. 12, 2014) at 5-8. Stark tried to teach P.W. basic skills like the alphabet, reading, rudimentary math, and how to tell time. She said her attempt to teach P.W. "wasn't going very well." RP (Nov. 12, 2014) at 4. Despite Stark's efforts, P.W. could not tell time and could not recite the alphabet on her own. Stark testified that DeLong also had a close relationship with P.W. She said they did "art stuff" and went to movies. RP (Nov. 12, 2014) 10. She described their relationship as "like daughter and father." RP (Nov. 12, 2014) at 10.

Although P.W. usually stayed at the Federal Way residence, she occasionally spent the night at her boyfriend Tim's house. Throughout February and March of 2014, Stark noticed that P.W. was spending more and more time at Tim's house. Eventually,

Stark asked P.W. why she was spending more time away from the Federal Way house.

After this conversation, Stark confronted DeLong and accused him of being a pedophile:

> [STATE]: What was [DeLong's] response to you calling him a pedophile?
>
> [Stark]: He said, "With children?" And I said yes, [P.W.] was a child. And he said, "I don't mess with children. What I do with [P.W.] is none of your business."

RP (Nov. 12, 2014) at 16.

Stark took P.W. to the Federal Way Police Department four days later. Stark and P.W. spoke with Detectives Richard Kim and Adrienne Purcella. Detective Kim testified that P.W. was difficult to understand and that "[s]he wasn't functioning as a normal adult." RP (Nov. 4, 2014) at 56. He explained that P.W. could not perform basic cognitive tasks:

> [Det. Kim]: A normal adult of her age would be able to read, write, spell, understand, and have a decent conversation with an adult, and [P.W.] did not have that interaction with us. When we asked her questions of her birthdate, her age, we asked her, her ABC's, we didn't get a response, a quick enough response. And it appeared that she was delayed to some degree.

RP (Nov. 4, 2014) at 58-59. The investigating detectives were unable to get meaningful information from P.W. After interviewing Stark, Detectives Kim and Purcella went to the Federal Way residence to interview DeLong. He agreed to return to the police station with them.

At the police station, Detective Kim informed DeLong that he was not in custody and that he was free to leave at any time. Detective Purcella read DeLong his Miranda[1] rights. Delong stated that he understood his rights and was willing to answer the

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

detectives' questions. DeLong denied any sexual relationship with P.W. He later admitted digital and genital penetration with P.W. "about 40 [or] 50 times." Exhibit (Ex.) 14. DeLong believed the sex with P.W. was consensual despite what he called her "learning disability": "I have not done anything wrong. [P.W.] is a mature woman when it comes to sex and I'll say it over and over and over again." Ex. 14.

DeLong also admitted to receiving payment for transporting P.W. and another woman to the Gig Harbor home of his friend, Marvin Douglass. He told the detectives that he brought the girls to Douglass to have sex with him, but the payment he received from Douglass was simply to cover transportation costs:

| | |
|---|---|
| [Det. Purcella]: | So I mean you knew they had sex. |
| [DeLong]: | Uh huh. |
| [Det. Purcella]: | Yeah. Okay. |
| [DeLong]: | Yeah. |
| [Det. Kim]: | Was the understanding did [P.W.] know that's why she was gonna go out there? |
| [DeLong]: | Uh huh. |
| [Det. Kim]: | She did. That she was gonna specifically go there to have sex with Marv [Douglass]? You're nodding your head, yes. |
| [DeLong]: | Yeah. |
| . . . | |
| [DeLong]: | Because of [Douglass's] income or what he wants to give and so I didn't get paid for the girls, I got paid for transportation. |
| [Det. Purcella]: | But you take the girls down there and then you get paid by him. |
| [DeLong]: | Yeah. |
| [Det. Purcella]: | And they have sex with him. |
| [DeLong]: | Yeah and they have sex. |
| [Det. Purcella]: | Okay. |
| [DeLong]: | But I'm just being paid for transportation. |

Ex. 14. At trial, Douglass testified that DeLong knew he was lonely and that DeLong offered to "bring somebody over to be company for [him]." RP (Nov. 10, 2014) at 23.

DeLong told police that Douglass was "a friend . . . and he wanted some female companionship." Ex. 14. Douglass said he occasionally gave the women food and small amounts of money, but he paid DeLong around $100 per visit to "cover his [travel] expenses." RP (Nov. 10, 2014) at 24, 30.

P.W.'s testimony at trial reveals her limited mental capacity. For example, P.W. could not state her correct age, the current time of day, or her address. She also failed to correctly recite the alphabet, omitting about 10 letters. Throughout her testimony, P.W.'s speech impediment required repeating questions and resulted in many unintelligible responses.

Nevertheless, P.W. testified that she knew what "sex" means. RP (Nov. 12, 2014) at 167. She explained that pregnancy could result from sex and she knew that one could contract certain diseases from having sex. P.W. explained that she had been married in the past and had three children from that marriage. She said she occasionally had sex with DeLong, but that she did not like it:

| [State]: | . . . Did you have [vaginal] sex with Jim [DeLong]? |
| [P.W.]: | Yep. |
| . . . | |
| [State]: | Did you like that? |
| [P.W.]: | Uh-uh. |
| [State]: | Did you tell him no? |
| [P.W.]: | I said no. I didn't want (unintelligible.) |
| [State]: | What? |
| [P.W.]: | (Unintelligible.) |
| [State]: | What was that? |
| [P.W.]: | I just said no. |
| [State]: | What did you tell him? |
| [P.W.]: | No. |
| . . . | |
| [State]: | . . . Are there times when you said yes to having sex with Jim [DeLong]? |

> [P.W.]: Once in a while, but a lot of times (unintelligible).

RP (Nov. 12, 2014) at 178-79. P.W. also explained that DeLong would take her to Douglass's residence to have sex with him in order to get money:

> [State]: Did Jim [DeLong] bring you to [Douglass's] place?
> [P.W.]: Yeah.
> [State]: Did he tell you why?
> [P.W.]: To have cash to pay the rent and the phone bill and electric bill.
> [State]: But you had to what?
> [P.W.]: Pay the phone bill.
> [State]: Pay the phone bill. Did [DeLong] tell you what you were suppose to do when you went to [Douglass's]?
> [P.W.]: Have sex with him and I don't like.
> [State]: Did you want to?
> [P.W.]: Uh-uh.

RP (Nov. 12, 2014) at 182.

P.W. also provided some testimony about Tim Blakeny[2] her alleged boyfriend. P.W. stated that she had lived with Blakeny on and off for five years and that she was currently living with him at the time of the trial. Throughout her testimony, P.W. referred to Blakeny as her "friend," her "playmate," and her "boyfriend." RP (Nov. 12, 2014) at 151; RP (Nov. 13, 2014) at 25. P.W. also testified that Scooby Doo was her boyfriend. Both DeLong and Stark were aware of P.W.'s relationship with Blakeny. Detective Purcella testified that she knew P.W. considered Blakeny as her boyfriend, but Detective Purcella made no contact with him.

On February 21, 2014, the State charged DeLong on one count of second degree rape, one count of first degree promoting prostitution, and one count of second

---

[2] The record contains two different variations of Tim's last name. Some parts of the record refer to P.W.'s boyfriend as Tim Blakely, other parts refer to him as Tim Blakeny. Generally, the attorneys and the trial court referred to him as Tim Blakeny, so we use that iteration.

degree promoting prostitution. The State later added one count of second degree theft. To support the second degree rape charge, the State alleged that DeLong "did engage in sexual intercourse with another person [who] was incapable of consenting to sexual intercourse by reason of being mentally incapacitated," a violation of RCW 9A.44.050(1)(b) and (f)(i). Accordingly, the to-convict instruction required as an element "that the sexual intercourse [with DeLong] occurred when P.W. . . . was incapable of consent by reason of being mentally incapacitated." Clerk's Papers (CP) at 50. The jury instructions defined mental incapacity as "a condition existing at the time of the offense that prevents a person from understanding the nature or consequences of the act of sexual intercourse whether that condition is produced by illness, defect, the influence of a substance, or by some other cause." CP at 52.

Before trial, DeLong sought to introduce evidence of P.W.'s consensual sexual relationship with her boyfriend to rebut the State's allegation that P.W. lacked the mental capacity to consent. Consistent with RCW 9A.4A.020—the "rape shield" statute—DeLong requested a hearing outside the presence of the jury to examine P.W. regarding her relationship with Blakeny. The trial court denied DeLong's motion and excluded any evidence of P.W.'s sexual relationship with Blakeny. The trial court concluded that DeLong's offer of proof was insufficient to justify a hearing on the issue and that the rape shield statute prohibited the evidence because it was not probative of P.W.'s mental capacity to consent.

A jury convicted DeLong on all counts. DeLong appeals.

ANALYSIS

Standard of Review

This court reviews a trial court's decision to admit or exclude evidence for an abuse of discretion. State v. McDonald, 138 Wn.2d 680, 693, 981 P.2d 443 (1999). A court abuses its discretion when it makes a manifestly unreasonable decision or bases its decision on untenable grounds or reasons. In re Det. of Duncan, 167 Wn.2d 398, 402, 219 P.3d 666 (2009).

A defendant's claim that the trial court violated his Sixth Amendment right to present a defense is reviewed de novo. State v. Jones, 168 Wn.2d 713, 719, 230 P.3d 578 (2010).

Evidence of P.W.'s Sexual Behavior

DeLong argues the trial court erred when it concluded that the rape shield statute prohibited evidence of P.W.'s sexual activity with her boyfriend, Tim Blakeny. We disagree.

The rape shield statute requires a defendant to submit "[a] written pretrial motion . . . stating that the defense has an offer of proof of the relevancy of evidence of the past sexual behavior of the victim . . . ." RCW 9A.44.020(3)(a). "If the court finds that the offer of proof is sufficient, the court shall order a hearing out of the presence of the jury" to determine whether the proffered evidence is admissible. RCW 9A.44.020(3)(c). Before a trial court holds a hearing to determine whether the evidence is admissible, the defendant must show relevance. DeLong's initial offer of proof contained a single sentence: "In this case, defense represents that [P.W.] has had and continues to engage in sexual activities with her 'boyfriend' Tim Blakeny." CP at 16. The trial court

denied DeLong's motion for a hearing under the rape shield statute. It concluded this offer of proof was insufficient because P.W.'s capacity to consent to sex was irrelevant.

We conclude the trial court properly determined that DeLong failed to meet his burden to show relevance. In State v. Summers, 70 Wn. App. 424, 853 P.2d 953 (1993), we held that evidence of the victim's prior sexual acts was irrelevant to show that the victim had the mental capacity to consent to sex. Summers, 70 Wn. App. at 434-35. The facts in Summers are nearly identical to this case. In Summers, the State alleged the defendant committed second degree rape when he had sexual intercourse with a woman who lacked the mental capacity to consent. Summers, 70 Wn. App. at 430-31. The defendant sought to introduce evidence of the victim's prior sexual acts to demonstrate that she possessed the mental capacity to consent to sexual acts. Summers, 70 Wn. App. at 432. The trial court excluded this evidence and we affirmed. We reasoned that evidence of prior sexual acts was irrelevant to demonstrate the victim's capacity to understand those sexual acts:

> Evidence of past sexual encounters does not necessarily show understanding of the nature and, even more clearly, the consequences of sexual intercourse, such as pregnancy or disease. The court's statement that the evidence was not probative is, of course a different way of saying that the evidence was not relevant. The best evidence of [the victim's] capacity to understand is her testimony. Whether she gained knowledge from prior sexual experience or otherwise is unimportant, the issue is her capacity to understand.
>
> . . . .
> Where the lack of capacity is based on a permanent, organic condition, it logically follows that prior acts of intercourse cannot demonstrate that the victim understands the nature and consequences because the prior acts may have occurred due to the same lack of capacity. The risk of undue prejudice from the admission of such evidence is high, while the benefit to the defense is insubstantial.

Summers, 70 Wn. App. at 434-35. The same reasoning applies here. Evidence of P.W.'s other sexual encounters is not probative on capacity to consent. As in Summers, the best evidence of P.W.'s capacity to consent was her own testimony to show her knowledge of sexual matters and her ability to make decisions. That she may have had other sexual encounters does not demonstrate a capacity to consent. The trial court reasonably concluded that the evidence of P.W.'s alleged sexual relationship with Blakeny was more prejudicial than probative. This is particularly true given the trial court's broad discretion in balancing the probative value of evidence against its potential prejudicial impact. See, e.g., State v. Rice, 48 Wn. App. 7, 11, 737 P.2d 726 (1987).

DeLong contends that Summers is distinguishable because P.W. exhibited a more "sophisticated" understanding of sex than the victim in Summers. Br. of Appellant at 30. Although P.W. showed some understanding of the nature and consequences of sexual activity, her capacity was not markedly better than the victim's in Summers. For example, like P.W., the victim in Summers had a basic understanding of the mechanics of sex, she knew about AIDS, and she knew that pregnancy could result from sex:

> [The victim's] only knowledge of AIDS was that "[w]hen a man puts a wiener in you and you get it from them." She knew that "[w]hen a man puts a wiener in you and the sperm comes inside of you and you have the baby," and thought that a baby "[c]omes out of like your stomach or something like that." She defined intercourse as "[w]hen a man holds you down and puts a wiener in you, and if they force it in you, if you want it or don't want it" and defined sex as "[w]hen a man does something or something.

Summers, 70 Wn. App. at 431. This is similar to P.W., who also testified that one could contract AIDS and get pregnant from having sex. P.W. testified that she had three children in a previous marriage. She also was aware that she was no longer capable of

-10-

becoming pregnant. In contrast, the Summers court noted that the victim "showed no understanding that she and Summers engaged in intercourse . . . or that she could have become pregnant or contracted a disease as a result." Summers, 70 Wn. App. at 432. Like P.W., the victim in Summers showed "confusion as to such fundamental and elementary facts" like her own age and what time it was. Summers, 70 Wn. App. at 432. Any difference between P.W.'s mental capacity and the Summers victim is negligible. Excluding evidence of P.W.'s sexual encounters under Summers did not amount to an abuse of discretion.[3]

DeLong also argues that the evidence was relevant to show that various individuals, including the investigating detectives, knew about P.W.'s relationship with Blakeny but did nothing to stop it. First, we note that nothing in DeLong's offer of proof contains any facts supporting this assertion. This evidence is not probative of P.W.'s capacity to consent. The detectives could have chosen not to investigate Blakeny for

---

[3] DeLong also argues that the rape shield statute did not apply here, because the evidence he sought to admit involved contemporaneous sexual acts and not "past" sexual acts. RCW 9A.44.020(2). We note that it is questionable whether the rape shield statute would apply to the evidence of P.W.'s allegedly contemporaneous sexual activity with Blakeny. See State v. Jones, 117 Wn. App. 221, 722-23, 70 P.3d 171 (2003) ("A quick reading of the rape shield statute, however, shows that it applies only to past sexual behavior . . . Any reading of the statute that conflates 'past' with 'present' sexual conduct is tortured."). However, DeLong did not present this argument below, and we therefore decline to address the issue here. RAP 2.5(a); State v. McFarland, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995) ("As a general rule, appellate courts will not consider issues raised for the first time on appeal."). But even if the rape shield statute did not apply here, for the same reasons discussed above, the trial court properly concluded under traditional evidentiary principles that the evidence was inadmissible as more prejudicial than probative. See State v. Carver, 37 Wn. App. 122, 124, 678 P.2d 842 (1984) (When proffered evidence falls outside the scope of the rape shield statute, the court "must apply general evidentiary principles of relevance, probative value and prejudice.").

several reasons, including, as the State notes, that Blakeny was also developmentally disabled. The record also shows that DeLong had a fair opportunity to cross-examine the witnesses regarding their opinions on P.W.'s mental capacity. Evidence that the detectives or anyone else did nothing in response to P.W.'s alleged relationship with Blakeny was also more prejudicial than probative.

For the same reasons discussed below, if the trial court erred, any error was harmless.

<u>Sixth Amendment Right to Present a Defense</u>

DeLong also contends that the trial court's decision to exclude this evidence violated his Sixth Amendment right to present a defense. Because the evidence was irrelevant, no Sixth Amendment violation occurred here. Even if the trial court erred, that error was harmless.

Both the federal and state constitutions protect a defendant's right to present a defense. State v. Hudlow, 99 Wn.2d 1, 14, 676 P.2d 553 (1984). In Hudlow, the court articulated a two part test to determine whether the exclusion of evidence violated this right. Hudlow, 99 Wn.2d at 15. First, the evidence must be relevant; a criminal defendant has no constitutional right to the admission of irrelevant evidence. Hudlow, 99 Wn.2d at 15. Second, if the evidence is relevant, the court considers whether the State has demonstrated a compelling interest that outweighs the defendant's interest in admitting the evidence. If the evidence is not relevant, the court need not reach the "compelling interest" question. State v. Jones, 117 Wn. App. 221, 234 n.2, 70 P.3d 171 (2003).

As discussed above, the evidence DeLong sought to introduce lacked relevance. DeLong contends that any prejudicial impact from evidence of P.W.'s sexual encounters is substantially outweighed by its highly probative value and that the trial court thus deprived him of his right to present a defense by excluding it. But, in Summers, the defendant made the same argument as DeLong under nearly identical circumstances, and we rejected it:

> [E]ven if the evidence here in question has some minimal relevance, it is not necessarily error to exclude it.
>
> Summers merely quotes general language from [Hudlow] and ignores the fact that the court acknowledged the state's interest in using the rape shield statute to bar evidence even if it is of arguably probative value which may distract and inflame jurors and its interest in encouraging rape victims to step forward and prosecute.
>
> "[T]rial judges retain wide latitude to limit reasonably a criminal defendant's right to cross-examine a witness based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."

Summers, 70 Wn. App. at 435-36 (quoting Michigan v. Lucas, 500 U.S. 145, 149, 111 S. Ct. 1743, 114 L. Ed. 2d 205 (1991)). As in Summers, given the evidence's questionable relevance and the State's legitimate prejudice concerns, the trial court did not infringe DeLong's constitutional right to present a defense.

But even if the trial court erred when it excluded this evidence, that error was harmless. Because the alleged error implicates DeLong's constitutional right to present a defense, it is harmless only if we are "convinced beyond a reasonable doubt that any reasonable jury would have reached the same result without the error." State v. Smith, 148 Wn.2d 122, 139, 59 P.3d 74 (2002).

Although constitutional harmlessness is a demanding standard, the record here contains overwhelming evidence of P.W.'s diminished capacity to consent to sexual interaction. First, P.W.'s exhaustive testimony shows her diminished mental capacity. As discussed above, P.W. could not tell time or accurately recite the alphabet. She also did not know her address or her correct age. Throughout her testimony, P.W. typically responded with simple, one-word answers. She also demonstrated an unusual obsession with toys, dolls, and Scooby Doo, who she at one point referred to as her "boyfriend." RP (Nov. 13, 2014) at 25.

Second, there was substantial evidence of P.W.'s understanding of sexual matters and previous relationships. Despite this evidence, the jury concluded that P.W. lacked the capacity to consent to sex.[4] For example, P.W. understood the difference between a "handjob," a "blowjob," and vaginal intercourse. RP (Nov. 12, 2014) at 173-74; RP (Nov. 13, 2014) at 13. During one exchange, defense counsel asked P.W., "You're actually good at hand jobs; is that right?" and P.W. responded, "(Laughing.) Yeah." RP (Nov. 13, 2014) at 13. Although P.W. did not testify directly about sexual encounters with individuals other than DeLong and Douglass, she did testify to previous relationships. She testified about at least three boyfriends in the past. She also stated that, at one point in time, she considered DeLong as her boyfriend. She also said that she had been married, and she had three children from that marriage. When defense counsel asked P.W. if she "didn't like to have sex with Jim," P.W. responded, "not every day." RP (Nov. 13, 2014) at 13. Despite all of this evidence of P.W.'s knowledge of

_____

[4] As discussed above, during his interview with detectives, DeLong admitted to having repeated sexual contact with P.W., so the main issue at trial was whether P.W. had the mental capacity to consent.

-14-

sexual matters and previous relationships, the jury still concluded that she lacked the capacity to consent to sex. Evidence of sexual activity with her then-current "boyfriend" would not have changed the outcome. Any error was harmless beyond a reasonable doubt.

### Prosecutorial Misconduct

DeLong contends the prosecutor made improper comments during closing argument amounting to prosecutorial misconduct. This argument fails. Even if the prosecutor's comments were improper, DeLong has failed to show the comments are incurably prejudicial.

A defendant claiming prosecutorial misconduct on appeal must demonstrate that the prosecutor's conduct at trial was both improper and prejudicial. State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). "Once a defendant has demonstrated that the prosecutor's conduct was improper, we evaluate the defendant's claim of prejudice on the merits under two different standards of review depending on whether the defendant objected at trial." State v. Sakellis, 164 Wn. App. 170, 183, 269 P.3d 1029 (2011). "If the defendant objected to the misconduct, we must determine whether the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict." State v. Anderson, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009). If the defendant failed to object, the court must ascertain whether the prosecutor's misconduct was so flagrant and ill-intentioned that it caused an "enduring and resulting prejudice" incurable by a jury instruction. State v. Stenson, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997). "This standard requires the defendant to establish that (1) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict,' and (2) no

curative instruction would have obviated the prejudicial effect on the jury." Sakellis, 164

Wn. App. at 184 (quoting State v. Thorgerson 172 Wn.2d 438, 455, 258 P.3d 43

(2011)).

DeLong highlights two portions of the prosecutor's closing argument. First,

DeLong claims the prosecutor improperly compared P.W. to a child:

> Children cannot and are not expected to understand the nature and consequences of sex. It is therefore illegal to have sex with them. And sadly, for some adults, they are mentally at the same level as children. And the law, this law, makes it illegal to have sex with them, too. There is too much danger, too much manipulation, too much abuse of power inherent in that.
> [P.W.] is like a sweet child. She doesn't appear to even realize that she could say no, that she could limit when and where and what in anything she would do. She doesn't quite understand that she has that power or that she should have that power. And because of that, she needs the protection of this law. She needs it. She is in many ways the epitome of who we want this law to protect.
>
> . . . .
> Consider that portion at the end of [DeLong's] interview with the detectives. Detective Kim, Detective Purcella were clearly getting frustrated with him. They were confronting him about the nature of [P.W.'s] disability and how he could possibly believe that it was okay to have sex with her and this is what he said.
> (Audio recording played)
> He tells them she has never said no. She's a child. She shouldn't have to say no. And the Defendant took gross and disgusting advantage of that. And now the trial's over and it's up to you. What are you going to do about it?

RP (Nov. 17, 2014) at 22-24. DeLong contends the prosecutor continued with this

theme and then ended with a "call to arms":

> And yet the Defendant saw [P.W.], and it must have been, a ha, here's a woman I can take advantage of, here's a woman I can make some money off of. And he kept doing it for years continuously.
> That's what this case is about. The Defendant told you how he did it. You have all the evidence. Now it's all up to you. You decide what's going to happen next. What are you going to do about it?

The law is clear, this man is guilty of everything he is charged with. Thank you.

RP (Nov. 17, 2014) at 54.

DeLong contends these comments were improper because they urged the jury to resolve the case on grounds other than the facts of the case and the applicable law. But this mischaracterizes the prosecutor's comments. Although it is improper for a prosecutor to "exhort[] the jury to send a message to society" during closing argument, nothing in the prosecutor's statements here arises to an improper emotional appeal. State v. Bautista-Caldera, 56 Wn. App. 186, 195, 783 P.2d 116 (1989); see also State v. Curtiss, 161 Wn. App. 673, 701, 250 P.3d 496 ("Urging the jury to render a just verdict that is supported by evidence is not misconduct."). In each of the cases cited by DeLong, the prosecutor asked the jury to "send a message" to society with their verdict or base their conclusion on facts or issues unrelated to the case. In Bautista-Caldera, for instance, the prosecutor told the jury, "do not tell that child that this type of touching is okay, that this is just something she will have to learn to live with. Let her and children know that you're ready to believe them and [e]nforce the law on their behalf." Bautista-Caldera, 56 Wn. App. at 195 (emphasis added). At no point during closing argument here did the prosecutor similarly ask the jury to send a message to other victims like P.W. that they would "believe them" and "enforce the law on their behalf."

In State v. Neal, 361 N.J. Super. 522, 826 A.2d 723 (App. Div. 2003), a perjury prosecution of a school board member, the prosecutor asked the jury to convict the defendant not just for the crime of perjury, but also for betraying his oath as a school board member and for betraying the children of the community he served. Neal, 826

A.2d at 734. The court found these statements improper because they distracted the jury from the facts of the case. Neal, 826 A.2d at 734. Nothing in the prosecutor's closing argument here is comparable to Neal. He never suggested the jury convict DeLong for any reason other than the charged offenses. Nor did the prosecutor argue that the jury hold DeLong accountable for betraying anyone other than P.W., the sole victim in the case. Compare Neal, 826 A.2d at 734 ("'I'm asking you to hold him accountable for the betrayal of the children [of] Asbury Park.'" (emphasis omitted) (alteration in original)). Further, the prosecutor's comparison of P.W. to a child did not introduce "facts not in evidence." Br. of Appellant at 35. The prosecutor's statements undoubtedly refer to the three separate witnesses in the case—Stark, Detective Kim, and Detective Purcella—who testified that P.W. behaved like a child.

But even if the prosecutor's comments were improper, DeLong has failed to show that they substantially affected the verdict. As explained above, the record shows overwhelming evidence of guilt. DeLong admitted sexual intercourse with P.W., and the State presented substantial evidence of P.W.'s diminished mental capacity. It is unlikely the prosecutor's benign comments affected the outcome.

DeLong did not object, and he has failed to show that "no curative instruction would have obviated the prejudicial effect on the jury." Thorgerson 172 Wn.2d at 455. DeLong cites State v. Walker, 164 Wn. App. 724, 265 P.3d 191 (2011). Walker is distinguishable. In Walker, the prosecutor substantially mischaracterized the law by telling the jury that determining the defendant's culpability depended on whether they "would have done the exact same thing [he did] if [they] had the same decision to make." Walker, 164 Wn. App. at 735. The prosecutor also had a powerpoint slide

-18-

instructing the jury that the entire case turned on whether "I would do it too, if I knew what he knew." Walker, 164 Wn. App. at 736. The court held the statements were improper because they "misstated the law of defense of others." Walker, 164 Wn. App. at 736. DeLong fails to show the prosecutor's statements amount to similar misconduct. DeLong never alleges that the prosecutor misstated the applicable law. Unlike this case, defense counsel objected in Walker. Walker, 164 Wn. App. at 735. None of the prosecutor's comments here were so egregious that they could not have been cured by an instruction.

Even in Bautista-Caldera, where the prosecutor asked the jury to show "children" generally that they were "ready to believe them and enforce the law on their behalf," the court held that "the improper comments are not nearly so extensive or egregious as those found to constitute reversible misconduct . . . We do not find any prejudice such as could not have been neutralized with a curative instruction." Bautista-Caldera, 56 Wn. App. at 195. The prosecutor's comments here are far less harmful than those in Bautista-Caldera. A curative instruction would have neutralized any prejudicial effect on the jury.

### Ineffective Assistance of Counsel

DeLong also argues that his attorney's failure to object to the prosecutor's closing statements, quoted above, violated his right to effective assistance of counsel.

We review claims for ineffective assistance of counsel de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009). "To prevail on a claim of ineffective assistance of counsel, counsel's representation must have been deficient, and the deficient representation must have prejudiced the defendant." State v. Aho,

137 Wn.2d 736, 745, 975 P.2d 512 (1999); Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "To establish ineffective representation, the defendant must show that counsel's performance fell below an objective standard of reasonableness. To establish prejudice, a defendant must show that but for counsel's performance, the result would have been different." State v. McNeal, 145 Wn.2d 352, 362, 37 P.3d 280 (2002) (citation omitted). Failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim. Strickland, 466 U.S. at 700.

We are reluctant to find ineffective assistance of counsel except in the most extreme cases. "[S]crutiny of counsel's performance is highly deferential and courts will indulge in a strong presumption of reasonableness." State v. Thomas, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). This is particularly true where, as here, the alleged deficient performance consists of an attorney's failure to object. "The decision of when or whether to object is a classic example of trial tactics. Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." State v. Madison, 53 Wn. App. 754, 763, 770 P.2d 662 (1989).

Delong has failed to show either deficient performance or prejudice. DeLong contends defense counsel was deficient for failing to object to the prosecutor's remarks. But, as discussed above, the prosecutor's remarks were not improper. It is reasonable to infer that counsel did not object because she believed the prosecutor's remarks were within appropriate legal boundaries and supported by the facts. The record here is insufficient to overcome the strong presumption that defense counsel acted reasonably when she declined to object to the prosecutor's statements. DeLong has failed to cite

any analogous cases demonstrating that defense counsel's performance here fell below an objective standard of reasonableness.

DeLong also failed to show prejudice. As discussed above, there was overwhelming evidence of guilt. It is unlikely the outcome would have been different had defense counsel objected to the prosecutor's statements. See McNeal, 145 Wn.2d at 362 ("To establish prejudice, a defendant must show that but for counsel's performance, the result would have been different.").

Statements of Additional Grounds

DeLong submitted two additional grounds for review. Both are meritless. First, Delong contends that his first attorney was ineffective. He complains this attorney would not discuss strategy with him and did not care whether or not he was innocent. But DeLong concedes that this attorney transferred to a different department early on in his case and did not represent him at trial. A different attorney represented DeLong for the majority of the case, including pretrial motions and the jury trial. Therefore, even if we assume, without deciding, that DeLong's first attorney was deficient, DeLong cannot show prejudice because his second attorney handled the overwhelming majority of DeLong's defense.

DeLong's second claim also fails. He contends that his second attorney was also ineffective, citing several disagreements he had with defense counsel's strategic decisions before and during trial. For example, he alleges that no doctor examined P.W. to determine her mental capacity. He also claims defense counsel did not meet with him to discuss his case and failed to thoroughly investigate his claim of innocence and discredit Stark as a "conspirator." DeLong's claim contains no citation to the

-21-

record, nor does he cite any relevant case law other than the cases outlining the legal test for an ineffective assistance of counsel claim. See, e.g., Strickland v. Washington, 466 U.S. at 687. Our review of the record revealed nothing supporting DeLong's claims. See State v. O'Connor, 155 Wn. App. 282, 293, 229 P.3d 880 (2010) ("[A]n appellate court is not obligated to search the record in support of claims made in a defendant/appellant's statement of additional grounds for review."). We need not consider DeLong's claims to the extent they rely on facts or evidence not in the record. See State v. Calvin, 176 Wn. App. 1, 316 P.3d 496 (2013). Further, DeLong's complaints are based on defense counsel's strategic decisions. These decisions enjoy a strong presumption of reasonableness, and usually "deficient performance is not shown by matters that go to trial strategy or tactics." State v. Studd, 137 Wn.2d 533, 551, 973 P.2d 1049 (1999). DeLong has failed to overcome that presumption. But even if counsel's performance was deficient, for the same reasons discussed above, DeLong cannot show that the outcome would have been different but for defense counsel's alleged errors.

## CONCLUSION

For the foregoing reasons, we affirm the judgment and sentence.

WE CONCUR: