IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 75111-5-I |
| | ) | (Consolidated with No. 75116-6-I) |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| LORI BYLYNN LLOYD, | ) | |
| CHRISTOPHER JOEL SEFTON, | ) | |
| AND EACH OF THEM, | ) | |
| | ) | |
| Appellants. | ) | FILED: May 21, 2016 |

SCHINDLER, J. — A jury convicted Christopher Joel Sefton and Lori Bylynn Lloyd of assault of a child in the first degree and criminal mistreatment in the first degree of six-year-old K.S. By special verdict, the jury found K.S. was a particularly vulnerable victim, Sefton and Lloyd engaged in an ongoing pattern or practice of assault for a prolonged period of time, and their conduct manifested deliberate cruelty against a family or household member. The court imposed an exceptional sentence.

Sefton seeks reversal of the conviction. Sefton argues (1) impermissible opinion testimony deprived him of the right to a fair trial; (2) in the alternative, his attorney provided ineffective assistance of counsel by failing to object to the opinion testimony; (3) the court violated his right to a unanimous jury trial by failing to give a unanimity instruction on assault of a child in the first degree; (4) sufficient evidence does not

support the alternative means of committing criminal mistreatment in the first degree; and (5) prosecutorial misconduct during closing argument deprived him of the right to a fair trial. Sefton also challenges the order to obtain a mental health evaluation as a condition of community custody and imposition of the no-contact order with his child D.S.

Lloyd seeks reversal of the conviction, arguing (1) sufficient evidence does not support the jury finding her guilty of assault in the first degree of K.S., (2) the conviction for assault in the first degree and criminal mistreatment violates double jeopardy, (3) the term "torture" to define the crime of assault of a child in the first degree is unconstitutionally vague, (4) the aggravating factors of deliberate cruelty and a particularly vulnerable victim are unconstitutionally vague, (5) the evidence does not support imposition of an exceptional sentence, and (6) her attorney provided ineffective assistance by failing to argue that assault of a child in the first degree and criminal mistreatment constitute the same criminal conduct.

We affirm the convictions of assault of a child in the first degree and criminal mistreatment in the first degree. We remand to determine whether to order a mental health evaluation of Sefton and if so, enter findings, and to determine whether to impose a no-contact order with D.S. and if so, address the scope and duration of the no-contact order with D.S.

## FACTS

Lori Bylynn Lloyd and Wesley Lloyd married in 2005 and lived in Florida. On January 15, 2006, Lloyd gave birth to a daughter, R.L. Wesley Lloyd died in July 2010. In August 2010, Lloyd moved to Auburn, Washington with four-and-a-half-year-old R.L.

Christopher Joel Sefton and Genevieve Jacobs began dating in late 2006. On May 3, 2007, Jacobs gave birth to their son, K.S. Sefton and Jacobs separated in 2008. Sefton and K.S. lived with Sefton's mother from 2008 until 2011.

Lloyd and Sefton started dating in 2011. In November 2011, Lloyd was pregnant and the couple got engaged. In December 2011, Sefton, his four-and-a-half-year-old child K.S., Lloyd, and her six-year-old child R.L. started living together in a two-bedroom apartment. On June 14, 2012, Lloyd gave birth to D.S. Lloyd worked during the week and weekends. Sefton stayed home with the children.

Gildo Rey Elementary School 2012 until January 2014

K.S. attended Gildo Rey Elementary School (Gildo Rey) beginning in the fall of 2012 through January 2014. At the beginning of kindergarten in September 2012, five-year-old K.S. had "rosy . . . chubby cheeks," "shiny" brown hair, and "big eyes." Auburn School District physical therapist Samantha Laskey began working with K.S. in September to improve his motor skills and coordination. Laskey described K.S. as "a really sweet kid" with "a lot of creativity and energy." K.S. often talked to Laskey and told her "how his day was going."

Near the end of the school year in 2013, the kindergarten teacher reported concerns about K.S. to school counselor Shannon Durnin. K.S. ate food from the garbage can and picked crumbs off the floor to eat. Durnin contacted Sefton. Durnin told Sefton the school could provide food to K.S. Sefton said K.S. had "psychological issues around food" and instructed Durnin not to give K.S. "extra food." Sefton told Durnin that K.S.'s biological mother withheld food from him when he was an infant, resulting in a failure to thrive.

At the beginning of the next school year in September 2013, Sefton filled out the student health information sheet for K.S. Sefton checked the box indicating K.S. had food allergies.[1] Sefton noted K.S. was allergic to "artificial colors and flavors" and not allowed to have "added sugar." School nurse Carrie Sasser sent a "diet prescription form" home with K.S. to learn what foods to avoid and what foods to substitute. The form is to be filled out by a doctor. Neither Sefton nor Lloyd ever returned the diet prescription form to the school.[2]

According to Gildo Rey first-grade teacher Tammy Boorn, K.S. followed expectations and did not "act out" in class. But K.S. often appeared "unkempt" with "patchy" hair and he usually was not clean when he came to school. K.S. wore clothes with holes and "didn't always have a coat." Boorn said K.S. was always hungry. Gildo Rey provided free breakfast and lunch to students. When K.S. was still hungry after eating lunch, Boorn let K.S. take leftover food out of the "share bin."

Physical therapist Laskey continued working with K.S. during first grade. Laskey noticed a significant change from the previous year. K.S.'s hair was "thin and kind of patchy," his face "sallow," his cheeks were "sunken in," and he had bags under his eyes. His demeanor had also changed. K.S. was "withdrawn," did not make eye contact, and acted "skittish." K.S. complained of being hungry and talked about food regularly. Laskey began bringing oranges to their therapy sessions. On one occasion, Laskey raised her voice "just a little" to tell K.S. not to climb on a table. K.S. "shut down" and hid under the table for 20 minutes "before he would even look" at her.

---

[1] The 2012 student health information sheet for K.S. did not indicate any food allergies.

[2] Sasser had over 20 years' experience working in the medical profession and was not "familiar with food allergies concerning added sugar."

4

On October 28, 2013, Boorn reported to school nurse Sasser that K.S. was "hungry in class and hoarding food." K.S. said he was given only crackers to eat at home. Sasser called Lloyd. Lloyd told Sasser that K.S. was on a "BRAT"[3] diet because he had been sick. Sasser expressed concern about the diet. Sasser told Sefton, "You don't want to give it very long because kids . . . get protein deficient fairly quickly." Lloyd "got really defensive." Lloyd said, "I know what gastroenteritis is, I've had kids before, I know what this is." Lloyd told Sasser K.S. had issues with food because of his biological mother "starving him when he was younger."

When K.S. was absent from school the next day on October 29, Sasser called Sefton. Sasser told Sefton K.S. looked like he was losing weight. Sasser asked Sefton if the family needed assistance with food. Sefton assured Sasser that "there was no problem with . . . having enough food." Sasser contacted Child Protective Services (CPS) to report possible neglect.

When K.S. returned to school on October 30, first-grade teacher Boorn noticed he had scabs on his face and was noticeably thin. Boorn called Sefton. Sefton told Boorn that K.S. had been sick. When Boorn asked what type of illness it was, Sefton replied, "I don't remember, . . . [K.S.] was probably lying about [being sick]" because "he's a liar." Boorn told Sefton that even if K.S. had stomach flu, he could still eat foods like rice and bananas. Sefton claimed K.S. "was starved as a baby by his mother" and "compared [K.S.] to a drug addict when it came to high fructose corn syrup." Sasser started regularly recording K.S.'s height and weight.

---

[3] Bananas, rice, applesauce, and toast.

On October 31, CPS social service specialist Heather Prescott interviewed K.S. at Gildo Rey. Prescott asked K.S. why he thought she was there to talk to him. K.S. responded, "My parents always spank me." K.S. told Prescott he ate crackers and water at home and he was on a "new diet" with "no high fruit corn syrup," candy, ice cream, or sugar. When Prescott asked what K.S. ate for dinner the night before, K.S. said, "Nothing. I did my homework. I asked for food last night and dad didn't have enough time." K.S. said, "Dad normally doesn't feed me at home until I do my homework right." K.S. told Prescott his stepsister R.L. gets to eat "[c]hicken, corn, and mashed potatoes" but he "can't have those things" because his doctor says he is allergic to sugar. When Prescott asked, "Do you ever eat bananas at home," K.S. responded, "No."

On November 8, Sound Mental Health therapist Amy McMahan began counseling sessions with K.S. McMahan met with K.S. at school during the lunch hour. K.S. "was very fixated on his food." He "ate quickly, very quickly"; would not talk to anyone while there was food around; and ate crumbs off the table. McMahan described K.S. as "little, small for his age, it seems like, very sweet, quiet, never saw any anger or outbursts or anything like that."

On November 19, CPS social worker Prescott met with Lloyd and Sefton at their home. Lloyd and Sefton said the CPS report was related to putting K.S. on a BRAT diet. Lloyd said she fed K.S. bananas and offered him stew but he "refused it." Lloyd expressed concern about giving K.S. other food because it could upset his stomach. Lloyd told Prescott they had known Sasser for three years and they did not get along well with her because Sasser wanted to feed K.S. "processed foods . . . like hot dogs."

Lloyd said they tried following Sasser's advice to feed K.S. what he wanted to eat but K.S. got sick after eating three peanut butter sandwiches. Lloyd told Prescott K.S. had issues with food that "stemmed from him being starved by his mother when he was younger."

Prescott interviewed R.L. in private. R.L. told Prescott that she and K.S. did not always eat the same food. R.L. said, "I eat bacon and he doesn't. I eat Jack-in-the-Box and he doesn't sometimes." When Prescott asked why K.S. does not eat those foods, R.L. responded, "He doesn't behave. It's something he can't have or it's too messy or greasy."

School counselor Durnin was on maternity leave during the fall of 2013 and Melodie Kieswether took her place. Boorn told Kieswether she was "concerned about [K.S.] because he was taking food out of the garbage." Kieswether and Sasser were concerned K.S. was suffering from malnutrition. K.S. told Kieswether he "took food out of the trash because he was hungry." K.S. said he was not allowed to eat the same food as the rest of his family and he usually just ate soup for dinner. Lloyd told Kieswether what food K.S. could eat. According to Kieswether, it seemed that "[e]very week there was different things [Lloyd] didn't want him to have."

Kieswether said K.S. often came to school "really, really fatigued." When she asked why he was so tired, K.S. explained, "[W]ell, I didn't do my homework right, so my dad would make me stay up and do my homework." Both Sefton and Lloyd contacted Kieswether "really concerned about the quality of [K.S.'s] homework." According to Kieswether, "they would make him do it over and over again until it was better." Sefton and Lloyd wanted K.S. to stay inside at recess as "punishment" because he was not

7

"working hard enough" or "doing a good enough job" on his homework. Kieswether said K.S. "just stole my heart. . . . He was always just really sweet. . . . [B]ut he was also just really sad." Kieswether called CPS at least twice about K.S.

In November, K.S. waited without a coat for the school bus for an hour and a half in the rain. When he arrived at school, K.S. was "shaking and he was blue." Kieswether gave K.S. dry clothes and a coat. K.S. returned to school after the winter break from mid-December 2013 to January 6, 2014 "noticeably thinner" with "dark circles under his eyes." Boorn saw K.S. try to eat food out of the trash in the classroom and the "dump station" where children throw away uneaten food. Boorn sent K.S. to Sasser. K.S. had lost four pounds over the winter break. Sasser contacted CPS.

School counselor Durnin returned to Gildo Rey from maternity leave in early January 2014. Durnin said K.S. looked significantly different. K.S. "looked really tired all the time," he "had bags under his eyes," and he seemed to have lost weight. Durnin believed K.S. appeared to be suffering from malnutrition. K.S. told Durnin his parents "were keeping him up at night" and "[t]here were lots of nights where he . . . didn't get dinner." K.S. said he was not allowed to eat when his family went to restaurants because he was "bad" or "allergic to the food." K.S. told Durnin that "as punishment," he had to do push-ups while wearing a backpack that contained cans of food or stand with his nose touching the wall for long periods of time. K.S. believed his father hated him and told Durnin, "I'd be better off if I wasn't here. My dad just doesn't like me."

Gildo Rey students were encouraged to wear Seahawks colors for "blue Friday" on January 10. K.S. came to school without a coat and wearing only a T-shirt. K.S. said his father took his coat away because he bragged to R.L. about the Seahawks

colors of the coat. Durnin made a referral to CPS about the weight loss and coming to school without a coat.

CPS social worker Nina Gonzalez met with K.S. at Gildo Rey on January 10. K.S. told Gonzalez that "when he is bad," his father and stepmother gave him cold showers, spanked him, and made him do push-ups wearing a backpack. K.S. said if he did not finish his homework, "he did not get to eat dinner and is sent to bed." K.S. told Gonzalez he "did not feel safe in the home with his father and stepmother because he is not allowed to eat sometimes."

On January 14, Sefton brought K.S. to school late. When they arrived at the classroom, K.S. asked if he could have breakfast. Sefton said, "[N]o, you already ate breakfast. . . . [P]ut your head down." When K.S. began sobbing, Boorn asked Sefton to leave. Boorn spoke with Sefton in the hallway. Sefton told Boorn K.S "needed to be punished" because he pushed his sister. Boorn described Sefton's behavior as "alarming" and "his tone was very aggravated." Boorn was "frightened" and insisted Sefton not come to her classroom. When Boorn returned to the classroom, she gave K.S. a peanut butter and jelly sandwich, an apple, and milk.

On January 15, CPS social worker Gonzalez met with Sefton and Lloyd at their home. Sefton and Lloyd told Gonzalez that when K.S. does not do his homework, he does not get dessert. Sefton and Lloyd said they made K.S. do 15 push-ups "as a way to blow off steam" but denied making him do push-ups with weights. The social worker accompanying Gonzalez observed a heavy backpack with cans in it. Sefton and Lloyd told Gonzalez that K.S. has behavioral problems at home and other methods of

punishment were unsuccessful. Gonzalez instructed Sefton and Lloyd to take the children to the doctor.

On January 16, a school social worker called Gonzalez about K.S. The social worker reported that K.S. was punished the night before with push-ups and time out and was not allowed to have breakfast that morning. The social worker reported K.S. said that "his father hit him in the face as punishment." Gonzalez did not contact Sefton or Lloyd.

On January 23, after eating breakfast at school, K.S. ate a muffin from the dump station and choked. After Boorn performed the Heimlich maneuver, K.S. was fine for the rest of the day. Sefton called later that day, upset the school did not notify him that K.S. choked while eating food out of the garbage can. Sefton told Gildo Rey Principal Jana Jo Uhlendorf that K.S. was "a manipulative little kid" and had been "soaking himself in food" at school. Sefton threatened to file a lawsuit. The school principal characterized Sefton as "[v]ery aggressive." Sefton called Auburn School District Superintendent Dennis Kip Herren. Sefton was "very abusive," angry, and "threatening" to school staff. Sefton told Herren the staff at Gildo Rey were putting his son's life in danger. After his conversation with Sefton, Herren learned about the CPS referrals and concerns for the safety of K.S. Herren decided to allow K.S. to transfer to Chinook Elementary School (Chinook) mid-year because of "the same exact nursing staff" at Chinook. School nurse Sasser worked at both Gildo Rey and at Chinook.

Chinook Elementary School January until March 2014

In January 2014, Sefton enrolled K.S. at Chinook. First-grade teacher Jill Hopkins said K.S. did not appear to "feel safe around his dad" and K.S. was shaky and

timid. K.S. was not focused on lessons and sat with "a listless kind of blank kind of stare." During class, K.S. was very focused on food and constantly "talking about it, asking about when he could have food, when the next time he would be able to get food, when we served food, [and] where we kept the food." K.S. told Hopkins he did not have dinner at home "because he was bad" and he was not "allowed" to sleep. K.S. had very little energy and often fell asleep in class, usually within two to three minutes after sitting down at his desk, and while outside during recess.

On January 30, Lloyd sent a handwritten letter to Hopkins. Lloyd identifies herself as the stepmother of K.S. Lloyd states K.S. will eat "breakfast at home from now on" and bring his lunch. Lloyd asked Hopkins to "please . . . not let him trade his food or eat extra food that isn't fruits or vegetables except occasional classroom treats." Lloyd and Sefton signed the letter she wrote.

Hopkins spoke to Lloyd once when she picked up K.S. from school. Lloyd warned Hopkins that K.S. would "want to try and get food from you, but don't let him because he just will kind of manipulate you." K.S. brought only half a sandwich and four carrot sticks for lunch. Sasser was concerned the lunch K.S. brought to school was deficient in protein.

On February 4, K.S. arrived at school "extremely upset" because he did not eat breakfast at home. The school principal helped K.S. calm down and gave him an apple. K.S. ate the entire apple, including the core. Hopkins e-mailed Sefton to tell him the lack of breakfast was hindering K.S.'s education. Sefton responded that K.S. "chose" to eat only a few bites of breakfast that morning because K.S. did not want to stop playing.

Sefton believed it was more important for K.S. to be on time for school than to finish breakfast.

On February 26, K.S. went to the school nurse's office. Health technician Karen Knight noticed his ear was "purple and very sore" and had "nail marks" on it. School counselor Jesse Rodriguez examined K.S. and noticed a large purple bruise on the top of K.S.'s ear and small round bruises on his forearms. The inside of his ear "also had some diagonal slash marks that looked like fingernail marks, as if somebody had reached out and grabbed him by his ear." When Rodriguez asked K.S. what happened to his ear, K.S. said he did not remember. K.S. told Rodriguez he had to sleep on the floor with no pillow or blanket when his family went on vacation the previous weekend. K.S. seemed "beaten down" and "defeated." Rodriguez called CPS to report physical abuse of K.S.

Sefton called Chinook the morning of February 27 and instructed office manager Lisa Wilkinson to make sure K.S. did not get breakfast. Sefton said he offered K.S. breakfast at home but K.S. refused to eat. Sefton said that when he dropped K.S. off at school, K.S. was crying and misbehaving in the parking lot. When K.S. arrived at school that day, he was "hysterical about not having any food." Hopkins gave K.S. a few orange slices and string cheese. After K.S. ate, he calmed down.

On February 28, CPS social worker Gonzalez interviewed K.S. at Chinook. School counselor Rodriguez was present. Gonzalez asked K.S. what he had for dinner the night before. K.S. said his father made "spaghetti with light sauce and chicken nuggets" for R.L. and she had ice cream for dessert. K.S. said his father made him "a special kind of medicine" for dinner that consisted of "a sandwich in a blender." When

Gonzalez asked why Sefton put the sandwich in a blender, K.S. responded, "I normally take big bites." K.S. said that unlike R.L., he was not allowed to eat spaghetti because "I'm messy with it" and "my mom doesn't want to deal with me because I'm too messy." Gonzalez asked K.S. if he eats breakfast every day before school. K.S. responded that he was not allowed to eat breakfast at home the day before because he took too long to get ready for school. K.S. said his father did not allow him to eat breakfast at school because "[h]e knew I was going to get a peanut butter and jelly sandwich and a cheese stick, and the peanut butter sandwich has food coloring in it."

Gonzalez asked K.S. about the injury to his ear. K.S. told Gonzalez his family went on vacation the week before and stayed at a hotel. K.S. said the hotel room had two beds but he had to sleep on the floor. K.S. said the mark on his ear "might be a carpet burn" from sleeping on the floor or from "a bunch of fleas biting my ear." K.S. said he sleeps on the floor at home because "[w]e use stuff for [the bed]. There's buckets in my bed." K.S. denied anyone grabbed his ear. Gonzalez asked K.S. if he was afraid of telling the truth because he might get in trouble. K.S. said, "[Y]eah." But K.S. insisted, "I don't know what happened."

Gonzalez asked K.S. what happens when his parents put him on time-out. K.S. told Gonzalez he has to do 15 or more push-ups, stand in the corner, or take cold showers. K.S. said if he leaves the time-out corner, Sefton "hits me on the bottom" with his hand "[m]ore than one time."

Gonzalez took photographs of K.S. and sent them to Seattle Children's Hospital for review. Child abuse pediatrician Dr. Rebecca Weister reviewed the photos. Dr. Weister believed the ear injury was "very worrisome for inflicted trauma." Dr. Weister

13

told Gonzalez that because the ear injury was not consistent with sleeping on the floor, a doctor should evaluate K.S.

Later that day, Gonzalez spoke to Sefton and Lloyd. Gonzalez told Sefton and Lloyd to take K.S. to Seattle Children's Hospital "to check the bruise on his ear." Because Sefton and Lloyd did not take K.S. to Seattle Children's Hospital, the hospital made a referral to CPS.

The next day, Saturday, March 1, CPS contacted the Auburn Police Department to conduct a welfare check. Sefton and Lloyd refused to take K.S. to Seattle Children's Hospital but agreed eventually to take K.S. to Auburn Medical Center. Sefton and Lloyd did not allow the other children to be examined. At approximately 5:00 p.m., CPS social worker Xiao Yu Jackson interviewed K.S. at the hospital. K.S. said he did not have lunch that day and he was hungry. K.S. told Jackson his ear injury was from sleeping on the floor.

The Auburn Medical Center physician described K.S. as "thin" and noted K.S. was "very hungry" and asked for food during the examination. The physician gave K.S. a sandwich, yogurt, juice, and milk. K.S. appeared "shaky" and had "resting tremors."

While waiting at Auburn Medical Center, Sefton and Lloyd exchanged a number of text messages. Lloyd said K.S. "managed to whine enough that they gave him food . . . lots of food," and told Sefton that K.S. is "having a great time with all the attention he's getting."[4] Sefton responded, "Really? Looks like he gets nothing else tonight then. . . . We'll have to deflate his ego. . . . I was going to suggest getting him something while we were out if he behaved while we were dealing with this shit . . . Not anymore."[5]

---

[4] Alteration in original.

[5] Last alteration in original.

Lloyd said the doctors took K.S. to get juice and K.S. "whined about being hungry and came back with his mouth already crammed full as well as an arm load of stuff." Lloyd told Sefton that K.S. ate the "junk" while the doctor was there but decided to save the sandwich for later. Sefton responded, "Bastard . . . . That figures . . . . First thing I'm doing in the car? Eating the sandwich." Lloyd told hospital staff they were going to dinner as soon as K.S. was discharged. The hospital released K.S. into Lloyd's care.

The following Monday, March 3, K.S. was absent from school. Sefton called and spoke to school counselor Rodriguez. Sefton was "really, really agitated and mad." Sefton told Rodriguez that K.S. "was trying to manipulate school personnel into giving him food." Sefton said K.S. had "mental health issues" and "should not be believed that anything was happening unless he was bleeding." Sefton remarked that CPS was discriminating against him as a single father. Sefton told Rodriguez he wanted all HIPAA[6] waivers revoked then hung up.

K.S. returned to school the next day, March 4. Nurse Sasser noticed his "nose was red, his lips were dry and cracked, and he had dark circles under his eyes." K.S. told Sasser his nose was red from sleeping on the floor. Sasser had to make a belt for K.S. because his pants kept falling down. Sasser asked K.S. if he had been eating. K.S. told Sasser his father put his sandwich in a blender but he did not like his food that way. Sasser gave K.S. a cheese stick and yogurt. Sasser e-mailed CPS social worker Gonzalez about her concern that K.S. was not eating enough and his parents were depriving him of sleep.

---

[6] Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, 110 Stat. 1936 (1996).

The school principal waited with K.S. until he was picked up from school that day. While waiting, the principal gave K.S. a bag of Goldfish crackers as a snack. Afterward, both Lloyd and Sefton called Chinook and spoke to office assistant Karen McCabe. Sefton was angry the school principal gave K.S. crackers and said K.S. "cannot have food other than what he's given at lunch." Lloyd said K.S. had issues with artificial color and sweeteners. Lloyd said she did not want K.S. to receive foods containing artificial colors or sweeteners because they "affected his behavior." According to Lloyd, K.S.'s behavior had been "off the charts the last couple weeks" because of the snacks he received at school.

In a letter dated March 4, Sefton told Sasser she was no longer allowed to examine K.S. Sasser characterized the letter as "threatening." Sefton also met with the Chinook principal. Sefton did not want Sasser communicating with K.S. and wanted to revoke K.S.'s IEP[7] and all HIPPA waivers. Sefton also insisted the teachers should have "eyes on [K.S.] all the time" to make sure he did not eat any food with artificial food coloring. During the meeting, Sefton became "more and more agitated" and "started rambling about just that [K.S.]'s not doing what he's supposed to be doing at home." Sefton had "nothing positive" to say about K.S. The principal said K.S seemed like a "kind hearted" boy. Sefton disagreed. When the principal tried to get Sefton to focus on K.S.'s strengths, "it was an awkward moment."

> I'd asked [Sefton], could you tell me any strength about [K.S.]. And it was an awkward moment, and I think he finally just kind of said, yeah, he's smart enough, you know, and — but I'm super positive, I really work with parents. And it was odd. It was — it was the only I would say conversation I've ever had with a parent where I even had to ask them to tell me something, tell me something great about your kid, or tell me

---

[7] Individualized education program.

something that's positive about your student. That was a big red flag for me.

Sasser told the Chinook school officials that if K.S. "showed any signs of distress at school," she had to provide assistance; and as a mandatory reporter, she had to report signs of abuse.

On March 7, Lloyd and Sefton took K.S. to Seattle Children's Hospital emergency department. Lloyd and Sefton told the hospital staff that K.S. was slapping himself and talking about poisoning himself. K.S. did not show any signs of self-injurious behavior. While in the waiting room, K.S. sat quietly and colored. A hospital social worker interviewed K.S. K.S. told the social worker he injured his ear by hitting himself repeatedly to stay awake so he could watch a movie with his father. The hospital released K.S. to Sefton and Lloyd.

In mid-March, K.S. came to school with athletic socks on his hands. Hopkins took off the socks. His hands were "red and worn and peeling and kind of swollen[ ]." Hopkins sent K.S. to school counselor Rodriguez. K.S. told Rodriguez his father told him not to take the socks off his hands. Rodriguez took the socks off his hands and saw K.S.'s hands were bright red, "as if they had been burnt." K.S. told Rodriguez he had to put his hands in hot water because he "upset his dad."

On March 18, Sasser met with K.S. after he fell asleep on the playground during recess. K.S. had bruises on his forehead and his hands were red and swollen. That same morning, Lloyd and Sefton exchanged several text messages. Sefton reported that a growth chart showed K.S. had lost weight since the last year but wondered if someone had "changed" the chart to show weight loss. Sefton said, "Also, they think the blenders are being given as punishment, rather then [sic] because we don't want

17

him to choke." Lloyd responded, "I've already talked to his teacher, what I told her was I added smoothies to increase his calorie intake because he was refusing to eat his healthy food because the nurse [was] feeding him junk and telling him we should too. Stick with that."

K.S. was not at school on March 19. Hopkins e-mailed Sefton and said she "hoped [K.S.] was home that day getting rest." Hopkins told Sefton that K.S. fell asleep at his desk the day before as soon as he got to school. Hopkins said K.S. fell asleep again during recess and "it was very difficult to wake him." That day, Sefton called the school. Sefton was "furious" that K.S. was sleeping at recess and said, "[M]y child cannot sleep during school." Sefton said K.S. was not sleeping at night and permitting K.S. to sleep at school would prevent him from sleeping at night.

On March 20, K.S. had trouble walking when he arrived at school. An office employee had to help K.S. to the classroom. When K.S. got to the classroom, Hopkins said he "was very hunched, kind of just sideways, . . . just very out of it, very drowsy, very weak." K.S. had socks on both hands. When K.S. "eventually" took off the socks, Hopkins saw his hands looked "extremely irritated, burned," and he was too weak to take the cap off a marker. Hopkins contacted Sasser. When Sasser came to the classroom, K.S. was "tremoring, shivering, and . . . shaking all over." K.S. was too weak to tie his shoes "he was tremoring so much" and looked exhausted. When Sasser left the classroom, she told the principal, "I'm just going to be honest, . . . you have to get him out of there before they kill him." The school principal called 911.

Police Investigation and Criminal Charges

Auburn Police Department Officer Aldo Arroyo responded to the 911 call. Officer Arroyo met with K.S. and CPS social worker Gonzalez. Officer Arroyo noticed K.S. had a purple mark on the right side of his lip. When Officer Arroyo asked K.S. how he got the "bruise," K.S. said that his father hit him. K.S. told Officer Arroyo it happened on the way home from school the day before when K.S. leaned forward in the car to tie his shoelaces. Sefton told K.S. to "lean back and quit moving." K.S. said his father became " 'really mad,' " struck K.S. in the mouth with an open hand, and K.S. started crying. When Officer Arroyo asked K.S. if it hurt when his father hit him, K.S. said, "Yes." K.S. told Officer Arroyo that when he told his father that his lip hurt, Sefton told him to "stop crying and sit back."

Officer Arroyo asked K.S. if his father usually hit him. K.S. said his father was "always mad and was really scary." K.S. told Officer Arroyo his father "makes me dizzy" by hitting him in the head. K.S. said Sefton hit him on the head "lots of times" and he felt dizzy "for a long time" afterward. K.S. said his father hit him before school that day because he wet the bed and got his sister's blanket dirty. K.S. said Sefton stripped off his pajamas, spanked him "really hard," "threw" him in the shower, and forced him to take a cold shower. K.S. was afraid that when he got home, his father would be mad at him. Officer Arroyo asked K.S. who he would live with if he could choose, and K.S. responded, "[Y]ou." Officer Arroyo took K.S. into protective custody.

Gonzalez took photographs of K.S. and then transported K.S. to Seattle Children's Hospital. Emergency department pediatrician Dr. Ron Kaplan examined K.S. Both of K.S.'s hands were "swollen and red and inflamed and irritated." Dr. Kaplan said

K.S. "looked very thin and pale and had a very protuberant abdomen and sort of a wasted appearance." The protuberant abdomen was significant—"as you start to get malnourished and have inadequate protein intake, you get that swelling, your abdomen starts to stick out." K.S.'s legs were swollen from the knees down and his skin had a "ruddy brawny appearance," suggesting a protein deficiency. During the examination, Dr. Kaplan discovered bruising on many different parts of his body. K.S. had bruises around his mouth, on his foot, on his upper arm, on his lower back, on his buttocks, and above his eyebrow. His hands and ear were red and swollen. The many bruises and signs of malnourishment made it "pretty clear that it was suggestive of abuse." Hospital staff took several photographs of K.S.

Child abuse pediatrician Dr. Weister examined K.S. at Seattle Children's Hospital the next morning on March 21. Dr. Weister reviewed the laboratory results that showed elevated liver enzymes, low phosphorous levels, and low prealbumin levels. The results were consistent with chronic malnutrition and suggested K.S.'s organs were being affected by malnutrition.

CPS removed K.S., R.L., and D.S. from Sefton and Lloyd. CPS placed R.L. with her paternal grandparents Jerri and Randy Lloyd in Florida. CPS placed K.S. and D.S. with Sefton's aunt and uncle Wendy and Charles Mosher. Wendy Mosher said K.S. did not have food allergies and was not a messy eater. K.S. gained 10 pounds during the first four weeks he lived with the Moshers.

The State charged Sefton and Lloyd with assault of a child in the first degree of K.S. between October 1, 2013 and March 20, 2014 in violation of RCW 9A.36.120(1)(b)(ii); assault of a child in the second degree of K.S. between October 1,

2013 and March 20, 2014 in violation of RCW 9A.36.130(1)(b); criminal mistreatment of K.S. in the first degree between October 1, 2013 and March 20, 2014 in violation of RCW 9A.42.020; one count of unlawful imprisonment of R.L. between April 1, 2011 and March 20, 2014 in violation of RCW 9A.40.010(6) and .040; one count of unlawful imprisonment of K.S. between April 1, 2011 and March 20, 2014 in violation of RCW 9A.40.010(6) and .040; and one count of unlawful imprisonment of D.S. between June 14, 2012 and March 20, 2014 in violation of RCW 9A.40.010(6) and .040. The State also charged Sefton with rape of a child in the first degree of R.L. in violation of RCW 9A.44.073 and assault in the fourth degree of D.S. in violation of RCW 9A.36.041. The State alleged the aggravating factors of a particularly vulnerable victim, manifest deliberate cruelty, and an ongoing pattern of abuse against a family or household member under RCW 9.94A.535(3)(b), (a), and (h)(i) and RCW 10.99.020.

Trial

The lengthy jury trial began on January 27, 2016 and ended March 10, 2016. The State called more than 35 witnesses to testify at trial, including Gildo Rey and Chinook teachers and staff, school nurse Carrie Sasser, CPS social workers, doctors, and family members. The court admitted into evidence over 100 exhibits, including more than 150 photographs of K.S., text messages between Sefton and Lloyd, and recorded videotaped police interviews of Sefton and Lloyd.

School district physical therapist Laskey testified Sefton was "very negative" about K.S. Laskey testified Sefton said K.S. was "violent" and "a bad kid" and Sefton "seemed more interested in talking about the things that [K.S.] was doing poorly." Laskey testified Sefton's description of K.S. "just didn't match up" with the child she

21

knew as "such a sweet kid." Laskey never observed K.S. behaving violently or aggressively or engaging in acts of self-harm.

Emergency medicine pediatrician Dr. Jonathan Chalett testified that Sefton and Lloyd brought five-year-nine-month-old K.S. to the Mary Bridge Children's Hospital emergency room on February 14, 2013. Sefton and Lloyd said K.S.'s behavioral problems escalated after a recent visit with his biological mother. According to Sefton and Lloyd, K.S. was hitting D.S., torturing cats, hanging stuffed animals, and talking about poisoning himself. Dr. Chalett met with K.S. Dr. Chalett testified K.S. was "well groomed," had a "calm manner," and was "cooperative" and "attentive." K.S. was "alert, and he was appropriate. He seemed to be happy. And when I was in the room with him, he was playing with crayons." K.S. displayed none of the symptoms Sefton and Lloyd reported. K.S. denied having thoughts of harming himself or others. Dr. Chalett testified the inconsistency between the behaviors Sefton and Lloyd reported and the behaviors he observed raised concerns.

Sound Mental Health therapist McMahan had family sessions with Sefton and K.S. McMahan testified Sefton struggled to "even acknowledge or recognize when [K.S.] was doing something positive." McMahan testified she did not have any concerns about how K.S. behaved and he did not display self-harming behaviors. Because of the discrepancy between the child she treated and the child Sefton described, McMahan believed there was "maybe a cover-up for what was really going on" in the home.

Family physician Dr. Neil Golan testified. Dr. Golan first saw K.S. on July 16, 2012. Five-year-old K.S. weighed 50 pounds and was in the 90th percentile for weight. Dr. Golan did not diagnose K.S. with any food allergies or intolerance and never

recommended that Sefton and Lloyd place K.S. on a restricted diet. Over the next nine months, K.S. went from 50 pounds to 56 pounds. At the February 14, 2013 visit, K.S. weighed 55 pounds and "hover[ed] at about the same weight for about a year." Dr. Golan testified:

> It's concerning when you see weight loss in a child. You should be seeing at this age weight gain gradually over time. If you have one outlier, you can often wait and see if a child catches up. It's not unusual to see an occasional abnormality.

When Dr. Golan saw K.S. on March 3, 2014, K.S. had grown several inches taller since his first visit but weighed only 51 pounds, putting him in the 50th percentile for weight. Dr. Golan expressed regret about K.S.—"I feel it's my job to take care of my patients, and I'm not so sure I did such a good job."

Seattle Children's Hospital child abuse pediatrician Dr. Weister testified the March 20, 2014 laboratory results indicated K.S.'s organs were "[s]ubstantially impaired" as a result of chronic starvation. The liver enzymes were mildly elevated. Dr. Weister testified, "[V]ery often with malnourishment you can have some either inflammation or some elevated liver enzymes just from starvation alone." The phosphorous level was low, which "is one of the findings that we watch very carefully in severely malnourished children, because that phosphorous level, as you refeed children, can bottom out as the fluids shift and change in your body." Dr. Weister testified that low phosphorous levels in children recovering from malnourishment could lead to slowing heart rate or arrhythmia. The prealbumin levels were low, which "is an indicator of poor protein nutrition." Dr. Weister explained the low prealbumin meant there was not "enough protein in the blood to keep the fluid in the blood vessels," resulting in the swelling of K.S.'s feet, ankles, and legs and the "brawny appearance of the skin."

Dr. Weister described the difference between child abuse and child torture. Child abuse "tends to be intermittent and sporadic . . . . Torture is much more of a systematic and progressive process by which children sustain ongoing and progressive and escalating physical abuse, psychological abuse." Dr. Weister testified torture can include "isolation from school, family activities, deprivation, things like food, water, food that other people in the family have." Torture can also include "other kinds of isolation within the family, such as scapegoating[," "restriction," or degradation, such as "being called names." Dr. Weister testified K.S.'s "situation had all the hallmarks of child torture."

Community and family members testified about how Lloyd and Sefton treated K.S. Waitress Renee Jesionowski testified that when the family was at the restaurant where she works sometime between late February and early March 2014, Lloyd ordered a sushi dinner for everyone except K.S. Lloyd told Jesionowski K.S. was "not eating" because he had food allergies. While the family ate dinner at the restaurant, no one in the family spoke to K.S. and Sefton would not allow K.S. to have crayons to color.

Elyse McKenna has a child who attended Gildo Rey. McKenna saw Lloyd, D.S., and K.S. in the school office. Lloyd "was cuddling and coddling [D.S.], but the whole time she was looking at [K.S.] like just horrible, . . . just this mean kind of look on her face." K.S. looked "helpless and neglected." McKenna testified that when she saw the family at the grocery store, K.S. "had his head down, and he was just kind of shuffling along, and his dad [was] kind of pushing him, pushing on him a little bit, telling him to keep his head down." Another time, McKenna saw the family eating lunch at a Sam's Club. The family was "all having lunch[,] eating and laughing and feeding the little one

and stuff," but K.S. was "kind of off away from the table with his back towards the family." McKenna testified K.S. was not eating and no one in the family was talking to him. McKenna thought K.S. was "being punished for something."

Mike Cordle, a maintenance technician at the apartment complex where the family lived, testified that sometime in 2014, he saw Sefton "forcefully bringing [K.S.] to the foot of this great big tree, . . . bring him to a stop right underneath the tree, and then reach down and — the dad grabbed a handful of dirt and shoved it in the kid's face." Sefton "smeared" the dirt all over K.S.'s face and K.S. "just grimaced, you know, like it was — he deserved it." While Sefton was "dragging" K.S. by the forearm, K.S. was "[s]huffling along, trying to keep from falling." Sefton then "[m]arched" K.S. back to the apartment. Cordle testified that approximately one to two months later, Sefton brought K.S. to the office. K.S. "had one sock over each arm, and it was taped above . . . the elbow." K.S. was "cradling his arms with his fists up towards his chin." K.S. appeared "very subdued" and "was quiet the whole time." Sefton told Cordle the socks were "to help [K.S.] learn to eat properly."

Sefton's sister Melissa Valliere testified that Sefton and Lloyd "never" said "anything positive" about K.S., they were "always saying how [K.S.] was a bad kid or he was doing bad things. And it was stuff that — he's a kid. It was stuff that should have been, you know, let him be a kid, it's not a big deal." Valliere testified that while at a buffet restaurant in approximately September 2013, Sefton and Lloyd allowed K.S. to eat only a small plate of vegetables. The other children ate "whatever they wanted" and went through the buffet line "as many times as" they wanted. Several children were "running around" and when K.S. "wanted to play," Sefton and Lloyd took him "off into a

corner" and told him he "couldn't play with people." Valliere felt they were "humiliating him in front of everybody in the restaurant because people were watching what was happening." When Valliere asked why K.S. was not allowed to eat more, Sefton and Lloyd told her to "mind [her] own business." Valliere decided to "stay[ ] away from them because we don't see eye to eye."

Eight-year-old K.S. testified that he did not like living with Lloyd and Sefton. K.S. said, "I hate them" because "[t]hey did bad things to me." When asked, "What type of things did they do that you did not like," K.S. answered, "Whacked me with a belt." K.S. testified neither Lloyd nor Sefton ever told him they loved him. K.S. said they never said "nice things" to him and only said "[m]ean things." K.S. testified that when he lived with Lloyd and Sefton, he did not get to play on sports teams, have friends come over, or go on field trips. K.S. did not want to talk "about sit-ups and push-ups." K.S. said Sefton gave him cold "bath[s]." K.S. testified he did not "always get to sleep in a bed with a blanket and a pillow" but everyone else in the family did.

K.S. testified Lloyd and Sefton did not let him eat food. K.S. said he "couldn't . . . eat food" because "[t]hey didn't let me." K.S. testified that Sefton put food in the blender and "blended it up" for him. K.S. said he did not want to eat the blended food because it was "disgusting." But if K.S. did not eat the blended food, he did not get any other food. K.S. testified Sefton and Lloyd treated him worse when he complained about being hungry.

Ten-year-old R.L. testified that Lloyd grabbed K.S. by the ear and pulled his ear as punishment and K.S. screamed because it hurt. R.L. said Lloyd told her K.S. was "a bad kid" who intentionally hurt himself to get attention. R.L. testified Sefton and Lloyd

spanked her and K.S. on "the bottom, on their sides, and their backs." R.L. said that "[m]ostly my mom . . . did the spanking" and "[s]ometimes she would hit us with her nails." R.L. testified she was afraid of her mother because Lloyd hurt R.L. and K.S.

R.L. said Sefton came into her room at night and touched her "girl part." During cross-examination, R.L. testified that she first disclosed the touching to her therapist in Florida.

Jerri Lloyd, the mother of Wesley Lloyd, testified that after Wesley died, Lloyd and R.L. immediately moved to Washington.[8] Jerri testified R.L. lived with her and had been in therapy since July 2014. On cross-examination, Jerri admitted she spoke with R.L.'s counselor about preparing R.L. for trial. Jerri also acknowledged she asked the counselor to find out more information about Sefton in preparation for trial.

Auburn Police Department Detective Douglas Faini testified about the police investigation and the recorded interviews with Sefton and Lloyd. Detective Faini and Detective Francesca Nix interviewed Sefton and Lloyd separately on March 27, 2014. Detective Faini testified about his approach to the interviews. Detective Faini testified that he accepted Lloyd's statements as true to encourage her to talk about what happened. By contrast, Detective Faini purposely said few words and used short phrases when interviewing Sefton to keep him talking.

At the conclusion of the case in chief, the State played the lengthy videotaped interviews with Sefton and Lloyd for the jury. The transcript of the interview with Sefton is 298 pages and the transcript of the interview with Lloyd is approximately 80 pages.

---

[8] We refer to Jerri Lloyd and Wesley Lloyd by their first names for clarity.

The detectives began interviewing Sefton at 12:38 p.m. on March 27. Sefton told the detectives that after K.S. choked on the muffin from the "trashcan" at school, "we started putting his breakfast in the blender at home." Sefton said they also blended K.S.'s food "so that we can control exactly what nutrients and stuff he is getting in his diet." Sefton said K.S.'s breakfast consists of blended bread, hot dogs, vegetables, water, and vegetable oil. Sefton said Lloyd is a professionally trained French chef so she is the "one who decided" the ingredients for K.S.'s blended meals and then "actually showed" Sefton how to make them. According to Sefton, the diet followed "the same guidelines given to us by a nutritionist [R.L.] had seen a few months prior."

The interview with Lloyd began at 5:05 p.m. on March 27. After approximately an hour, Lloyd told Detective Faini and Detective Aaron Williams she did not know about Sefton blending breakfast for K.S.

At approximately 6:00 p.m., Detective Faini returned to the interview with Sefton. Detective Faini asked Sefton why Lloyd was unaware of the blended meals. Detective Faini told Sefton that everything Lloyd said was consistent except for the part about her food expertise. Detective Nix said, "[Y]ou know what that indicates to me? That indicates to me that [Lloyd] knows she's been doing something wrong."

At 6:34 p.m., Detective Faini and Detective Nix returned to the interview with Lloyd. Detective Nix told Lloyd that according to Sefton, it was her idea to give K.S. the blended food. Lloyd responded that she was not home during breakfast and K.S. is not on a liquid diet. Detective Nix told Lloyd, "You can't deny this. . . . Deniability is not a way out in this one." Detective Faini added, "We are looking at, are you purposely abusing this child to the point of starvation where he is malnourished and he has to be

hospitalized." Lloyd answered, "No. I'm not." Later, Lloyd claimed K.S. and R.L. both get snacks after school. Detective Faini said, "Nope. There is no snacks. Absolutely no snacks. Here's the problem. I take what [Sefton] says and I kind of take what you said and then I take what the doctors say and I've got neglect because [Sefton] is not making any sense." The detectives ended Lloyd's interview at 7:06 p.m.

At 7:10 p.m., Detective Faini and Detective Nix informed Sefton that Lloyd was "under arrest. And you're under arrest for neglect of a child felony." Detective Faini told Sefton that Lloyd "made some additional comments" and "it is quite clear that I, I believe the food issue, the chopping up in a blender was not in an effort to make sure [K.S.] had adequate food but it's a form of discipline." Detective Faini said Lloyd "has a completely different story as to what was going on and why it was going on. And . . . claims ignorance to everything." The detectives told Sefton that Lloyd denied giving him the recipe for the blended meals or showing him how to make the "smoothies." The detectives asked, "How can you guys be so off" and, "Why would she lie"?

> I'm gonna tell you right now you tried to take this story coupled with her story then take everything the medical community has to say, and what your kid is saying there's no way they're gonna believe that you were doing everything you could to keep him . . . properly nutritioned. No way.

Detective Faini said that if Lloyd "is lying then why is she lying? And I'm gonna tell you what the answer is gonna be because she knew [Sefton] was so wrong she doesn't wanna come to grips with it." The interview ended at 7:36 p.m.

Detective Faini interviewed Lloyd again the next morning, March 28. Detective Faini told Lloyd:

> According to [Sefton] [the children] either had split pea soup at dinner or he does a blended meal and according to him [K.S.] is not allowed to have normal food at dinner. Uhm, or even a plate because of the concern of

him self harming and choking himself. . . . So I need to know what's going on.

Detective Faini told Lloyd, "[A]t this point what we, what we know from talking to [K.S.] . . . [i]s much of what [Sefton] is saying . . . [i]s true."

> [B]ecause [K.S.] is telling us the same thing. That if [K.S.] doesn't drink the nasty shake there is no food. That if he sneaks in a snack a punishment is you don't get the next meal or to eat the next day. That if he has issues with math there is a punishment of food by [Sefton]. You need to understand.

Lloyd responded, "What I do when I make dinner is I chop the food" for K.S. "so he can't choke on it." Lloyd denied K.S. "had lost 15 pounds" during the recent school year. Lloyd said that during the past year, she was not always home for dinner because she was at work. Lloyd told Detective Faini that Sefton "had asked me what to make. What to put in smoothies and it's what I told him was a handful of vegetables, a handful of fruit, a protein and a little honey if it needs it." Lloyd said she disagreed with Sefton about punishing K.S. by withholding food.

> When [Sefton] had talked about not giving [K.S.] dinner because he was in trouble I told [Sefton] that that's [sic] an acceptable punishment. That it may have been something that our parents did but it's not an acceptable punishment.

Sefton and Lloyd testified. Sefton testified he had to "discipline" K.S. because K.S. "was lashing out violently at himself, at [R.L], at [D.S], at me, at [Lloyd]." Sefton said he never withheld food from K.S. as punishment and when K.S. went to bed without dinner, it was because he refused to eat. Sefton testified that after choking on the muffin at school, K.S. stopped eating breakfast and lunch at school because Sefton no longer trusted the school to monitor him safely. Sefton said K.S. threatened to commit suicide by making himself choke. Sefton admitted that after "the choking

incident," he prepared blended meals for K.S. that consisted of vegetables, peanut butter, hot dogs or baloney, olive oil, and water. Sefton admitted spanking K.S. and making him do push-ups and sit-ups. Sefton testified, "[W]e also added running" to "help him burn off energy." Sefton said he never intentionally deprived K.S. of sleep. Sefton said K.S. was tired in school because he stayed awake "picking on" R.L.

Lloyd testified R.L. and K.S. sometimes fought and would have "bumps or bruises from getting into fights with each other." Lloyd said K.S. was "aggressive" toward D.S. and would "hit or kick or shove" D.S. Lloyd said that when she and Sefton put K.S. in time-outs to punish him, K.S. would "beat his head against the wall or slap himself or bite himself." To prevent K.S. from hurting himself, Sefton and Lloyd started having K.S. do sit-ups or push-ups instead of regular time-outs.

Lloyd testified she is a trained chef. "I am classically French trained. I went to the Cordon Bleu culinary school in Seattle." Lloyd testified she was not aware Sefton prepared blended meals for K.S. Lloyd said she "would make smoothies from time to time" as snacks for the children, "normally with fruit in them," but she did not teach Sefton to "make these blenders that contained hotdogs, vegetable oil, broccoli, and bread." Lloyd said that on the nights when she was home, she made dinner for the family. When asked if the children ever "came to you and said they hadn't gotten a meal, such as lunch or dinner," Lloyd said there was "maybe two or three times" when she came home from work at lunchtime, Sefton was "too busy with [D.S.] while [D.S.] was teething," and the children told her they "hadn't had lunch." Lloyd testified, "Occasionally, I'd get home from work . . . and something would have happened and they wouldn't have had dinner. And I'd have to throw something together real quick to

feed them." Lloyd testified the children never came to her and said, "[W]e didn't get breakfast." According to Lloyd, "neither of the kids ever really came to me and complained about anything."

At the conclusion of the case, the court granted the State's motion to dismiss unlawful imprisonment of D.S., count six.

The court instructed the jury on the charged crimes and the aggravating factors. The court agreed to give jury instructions on the lesser included crime of criminal mistreatment of K.S. in the second degree.

The jury convicted Lloyd and Sefton of assault of a child in the first degree of K.S., assault of a child in the second degree of K.S., and criminal mistreatment in the first degree of K.S. The jury found Lloyd and Sefton not guilty of unlawful imprisonment of R.L. and K.S. The jury found Sefton not guilty of assault in the fourth degree of D.S. The jury could not reach a unanimous verdict on the charge against Sefton of rape of a child in the first degree of R.L. By special verdict, the jury found the aggravating factors for the convictions of assault of a child in the first degree and criminal mistreatment in the first degree of a particularly vulnerable victim, deliberate cruelty, and an ongoing prolonged pattern and practice of physical abuse of a household or family member. Specifically, the jury found "a pattern or practice" resulting in "bodily harm" to K.S. "greater than transient physical pain or minor temporary marks" and "equivalent to that produced by torture."

At sentencing, the court granted the motion to dismiss the conviction of assault of a child in the second degree of K.S. as barred by double jeopardy. The court imposed a concurrent exceptional sentence for Sefton and Lloyd of 240 months on assault of a

child in the first degree of K.S. and 120 months on criminal mistreatment of K.S. in the first degree. The "Findings of Fact and Conclusions of Law for Exceptional Sentence" as to Sefton and Lloyd state, in pertinent part:

> The jury has found the following aggravating circumstances beyond a reasonable doubt, pursuant to RCW 9.94A.537 as to both Counts I & II: Particularly Vulnerable Victim RCW 9.94A.535(3)(b); Deliberate Cruelty RCW 9.94A.535(3)(a), and Ongoing Pattern or Practice of Physical Abuse for a Prolonged Period of Time RCW 9.94A.535(3)(h)(i) committed against a family or household member; a crime of domestic violence as defined under RCW 10.99.020.
>
> Absent imposition of an exceptional sentence, the jury's findings of these three aggravating factors as to Counts I and II would essentially be disregarded for purposes of sentencing. Moreover, the defendant[s'] criminal conduct does not warrant imposition of a standard range sentence and to impose a standard range sentence would be unjust. These findings constitute substantial and compelling reasons justifying an exceptional sentence.
>
> The court finds that the exceptional sentence is consistent with and in furtherance of the interests of justice and the purposes of the Sentencing Reform Act[ of 1981, chapter 9.94A RCW].

Sefton and Lloyd appeal.[9]

## ANALYSIS

### SEFTON APPEAL

#### 1. Opinion Testimony

Sefton seeks reversal of the jury conviction for criminal mistreatment of K.S. in the first degree. Sefton asserts that during the videotaped interviews played to the jury, the detectives expressed improper opinions on guilt. The State argues that because Sefton did not timely object at trial, he cannot raise this issue for the first time on appeal. We agree with the State.

---

[9] Sefton and Lloyd adopt each other's arguments on appeal.

Improper opinion testimony regarding a defendant's guilt may constitute reversible error because such evidence violates the constitutional right to an independent determination of the facts by the jury. State v. Kirkman, 159 Wn.2d 918, 927, 155 P.3d 125 (2007); State v. Montgomery, 163 Wn.2d 577, 591, 183 P.3d 267 (2008). "Defendants fail to preserve an issue for appeal when they do not object to impermissible opinion testimony at trial." State v. Embry, 171 Wn. App. 714, 739, 287 P.3d 648 (2012). To raise an error for the first time on appeal, Sefton must demonstrate that the error was "manifest" and truly of constitutional dimension by identifying the constitutional error and showing how the alleged error actually affected his rights at trial. RAP 2.5(a)(3); Kirkman, 159 Wn.2d at 926-27.

Pretrial, the court granted Sefton's motion to exclude police witness opinion testimony "of the existence of probable cause." The State played the videotaped police interviews of Sefton and Lloyd at the conclusion of the State's case in chief. The prosecutor told the court that the State had intended to play the recordings in rebuttal, but after "the defendants in opening indicated they were going to testify" and "after trying to streamline the timing of the State's case . . . after conversation with defense," the State decided to play the videos in its case in chief. Without any objection from defense, the court admitted the videotaped recordings and the transcripts of the interviews of Sefton and Lloyd.

The State played Sefton's six-hour videotaped police interview beginning March 1 through March 2, 2016. After playing almost all of Sefton's interview, Sefton's

attorney first raised an objection to the detectives' opinion on guilt, but agreed to

address the issue during cross-examination.

> [SEFTON'S ATTORNEY]: I might be incorrect, but I thought in my trial brief that I included an officer's opinion as to whether my client's guilty should not come in and I think it has.
>
> THE COURT: You didn't object to the exhibit. I didn't know it was in the exhibit.
>
> [SEFTON'S ATTORNEY]: Okay, okay.
>
> THE COURT: I mean, I think you can handle it on cross.
>
> [SEFTON'S ATTORNEY]: Yeah. Okay.
>
> THE COURT: This certainly can be a technique. They don't necessarily have to believe what they're saying.
>
> [SEFTON'S ATTORNEY]: Fair enough, fair enough. I wanted to raise it because I — considering myself to be in error, your Honor.
>
> THE COURT: And I think you should talk to him on a break about those issues before you cross. I understand what you're saying, and I don't know what his answer's going to be. Ms. [Prosecutor], maybe you can help us out.
>
> [PROSECUTOR]: Well, two things. I think we had a separate and distinct [CrR] 3.5 hearing, and the Court wholly admitted the entirety of the statement. And then there were no further motions in limine to limit any aspects of this recording.
>
> Moreover, the detective is going to testify that this whole entire interview was a — he employed various techniques, which included allowing the defendants to basically talk themselves to death. And then he went back and tried to attack them on certain levels, agreeing with them on certain facts. Like, obviously, we don't necessarily believe that Genevieve Jacobs-Smith is a domestic violence batterer, for example, but that is a technique the detective is employing in order to try to get the defendant to admit guilt in intentionally using food as a form of punishment.
>
> THE COURT: And I've heard that a lot, and they don't have to believe what they're asking or what they're telling him, it's part of their technique. What I don't want is you to assume that opens the door, then, to saying, but did you believe that.
>
> [PROSECUTOR]: Of course not.
>
> THE COURT: And that's where I think your motion in limine — so I think — I think we're okay.
>
> [SEFTON'S ATTORNEY]: Okay.
>
> THE COURT: All right.

[SEFTON'S ATTORNEY]: I appreciate you hearing the motion, your Honor.

THE COURT: No problem.

On cross-examination, Sefton established the detectives used "ruses" and other interrogation tactics in the interviews rather than expressing their personal beliefs. Sefton's attorney examined Detective Faini about the interrogation tactics he used during Sefton's interview. Sefton's attorney asked Detective Faini whether he lies during interrogations to seek a confession. Detective Faini confirmed that he lies during interrogations "to build trust." As an example, Detective Faini complained about CPS during the interview to make Sefton feel understood. In another example, Detective Doll said at the end of Sefton's interview, "You didn't intend to hurt him it just flat got away." Detective Faini explained Detective Doll was not "sincere" but only continuing the same interview "methodology" that Detective Faini was using when he told Sefton earlier, "I think it got away from you [Sefton]. I don't think you're a bad person I think you got into a bad situation over your head and it got away from you."

On appeal, Sefton concedes he did not request a motion in limine to exclude improper opinion testimony on guilt or object before the State played the videotaped interviews. In Montgomery, the court held improper opinion testimony on guilt "does not establish actual prejudice" where the defense did not object and the court instructed the jury they are the sole judges of the credibility of witnesses. Montgomery, 163 Wn.2d at 594-96. As in Montgomery, the failure to timely object bars Sefton from claiming error. RAP 2.5(a); Montgomery, 163 Wn.2d at 595. Further, the court properly instructed the jury as in Montgomery that jurors "are the sole judges of the credibility of each witness."

Montgomery, 163 Wn.2d at 595-96. Sefton waived his right to raise the issue for the first time on appeal and he cannot show manifest constitutional error or prejudice.

### 2. Ineffective Assistance of Counsel

In the alternative, even if the objection was not preserved, Sefton argues trial counsel provided ineffective assistance by failing to timely object to the interviews. A criminal defendant has the right under the Sixth Amendment to the United States Constitution to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). There is a strong presumption that counsel's representation was effective and competent. State v. McNeal, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). Legitimate trial strategy or tactics cannot be the basis for an ineffective assistance of counsel claim. McNeal, 145 Wn.2d at 363.

To demonstrate ineffective assistance of counsel, the defendant must show both deficient performance and resulting prejudice. Strickland, 466 U.S. at 687; State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Deficient performance is representation that falls below an objective standard of reasonableness based on consideration of all the circumstances. State v. Thomas, 109 Wn.2d 222, 226, 743 P.2d 816 (1987). To establish prejudice, the defendant must show a reasonable probability that the result would have been different without the error. State v. Lord, 117 Wn.2d 829, 883-84, 822 P.2d 177 (1991). If a defendant fails to satisfy either part of the test, our inquiry ends. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

The attorney's cross-examination of Detective Faini and Sefton's closing argument demonstrate strategic reasons not to object to playing the entirety of the recorded interview. During the lengthy interview, Sefton never admits that he withheld

food from K.S. as punishment. His position in the interview is consistent with his trial testimony.

During cross-examination, the attorney established that even when Detective Faini employed interrogation tactics meant to reveal the truth, Sefton's position remained consistent. On cross-examination, Detective Faini said his initial approach was to "soften the interview" with Lloyd by being "social" with her. Detective Faini testified that when he and Detective Nix returned to Lloyd's interview after speaking with Sefton, they changed their approach. Detective Faini testified, "And so at this point we decided to change it up with her a little bit and see if we can go ahead and start pushing back with, we know this is a lie, we know this is a lie, here's some information, and start pressing back." Detective Faini stated, "And so we decided to confront [her] a little bit and see if we can change her mindset to be honest with us." Detective Faini admitted he "exaggerate[d] the truth" in confronting Lloyd. Detective Faini conceded another interrogation tactic he used was to give Lloyd just two options, "either you're complicit or you turned a blind eye."

Detective Faini testified, "I'm not trying to get a confession, I'm just trying to get the truth out. And my attempt is to try to enact some type of reaction where he would be more truthful." Counsel asked, "However, [Sefton] didn't change from his position that he gave [K.S.] the blended drinks because of a choking issue . . . even with that"? Detective Faini responded, "Correct."

During closing argument, Sefton's attorney specifically asked the jury to view the videotaped interview again:

> I will ask you, if you review the video again, you know, do it again, but check out Mr. Sefton when he gets the news that he is . . . under arrest for

these issues, and the way that he holds himself and the way that he says, it was about choking, it was about choking. He never changed his position. I'm going to ask you to consider his demeanor absolutely, please, in that video, in the courtroom, on the witness stand. And, you know, it doesn't comport with this mad man, this terrible, angry man as he's been characterized here.

We conclude Sefton cannot establish ineffective assistance of counsel.

### 3. Unanimity: Assault of a Child in the First Degree

Sefton argues the trial court violated his right to a unanimous jury verdict for assault of a child in the first degree of K.S. Sefton contends that because witnesses testified about at least three possible injuries that could have resulted in substantial bodily harm to K.S., the court erred in failing to give a unanimity instruction.

A defendant may be convicted only when a unanimous jury concludes the defendant committed the criminal act charged in the information. State v. Kitchen, 110 Wn.2d 403, 409, 756 P.2d 105 (1988). If the State presents evidence of multiple acts that could be the basis of one charged crime, either the State must tell the jury which act to rely on or the court must instruct the jury to agree on a specific criminal act. Kitchen, 110 Wn.2d at 409. However, "the State need not make an election and the trial court need not give a unanimity instruction if the evidence shows the defendant was engaged in a continuing course of conduct." State v. Fiallo-Lopez, 78 Wn. App. 717, 724, 899 P.2d 1294 (1995).

The State charged Sefton and Lloyd with assault of a child in the first degree in violation of RCW 9A.36.120(1)(b)(ii). The information alleged:

> That the defendants LORI BYLYNN LLOYD and CHRISTOPHER JOEL SEFTON and each of them in King County, Washington, between October 1, 2013 and March 20, 2014, being 18 years of age or older, did intentionally assault and cause substantial bodily harm to K.S. (DOB 5/3/07), a child under age 13, and the defendants had previously engaged

in a pattern or practice of (a) assaulting K.S. (DOB 5/3/07), which assaults resulted [in] bodily harm that is greater than transient physical pain or minor temporary marks, or (b) causing K.S. (DOB 5/3/07) physical pain or agony that is equivalent to that produced by torture.

RCW 9A.36.120 states, in pertinent part:

(1) A person eighteen years of age or older is guilty of the crime of assault of a child in the first degree if the child is under the age of thirteen and the person:
  (a) Commits the crime of assault in the first degree, as defined in RCW 9A.36.011, against the child; or
  (b) Intentionally assaults the child and either:
  (i) Recklessly inflicts great bodily harm; or
  (ii) Causes substantial bodily harm, and the person has previously engaged in a pattern or practice either of (A) assaulting the child which has resulted in bodily harm that is greater than transient physical pain or minor temporary marks, or (B) causing the child physical pain or agony that is equivalent to that produced by torture.[10]

"Substantial bodily harm" is defined as "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." RCW 9A.04.110(4)(b). The Washington Supreme Court has held the term "substantial" "signifies a degree of harm that is considerable and necessarily requires a showing greater than an injury merely having some existence." State v. McKague, 172 Wn.2d 802, 806, 262 P.3d 1225 (2011).

In State v. Kiser, 87 Wn. App. 126, 940 P.2d 308 (1997), we held that assault of a child under RCW 9A.36.120(1)(b)(ii) is the culmination of a pattern or practice of assaulting or torturing a child, it is not a single act. Accordingly, because assault of a child requires proof of a continuing course of conduct, as a general rule, a unanimity instruction is not necessary. Kiser, 87 Wn. App. at 130; see also 11 WASHINGTON

---

[10] Emphasis added.

PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 35.35.03 cmt. at 560 (4th ed. 2016).

In Kiser, the defendant was convicted of assault of a child in the first degree for the abuse of his son. Kiser, 87 Wn. App. at 128-29. The court held that because the crime necessitates "a previous pattern or practice of causing pain[,] . . . it is not necessary for all jurors to agree on what act was the principal assault." Kiser, 87 Wn. App. at 130.

> RCW 9A.36.120(1)(b) requires proof of a principal intentional assault which causes substantial bodily harm, and a previous pattern or practice of causing pain. The crime thus is defined not by a single act, but by a course of conduct. The definition of the crime permits the State to charge an entire episode of assaultive conduct as one count. The jurors must all find a principal act resulting in substantial bodily harm preceded by a pattern or practice of other assaultive acts. But it is not necessary for all jurors to agree on what act was the principal assault.

Kiser, 87 Wn. App. at 130.[11]

However, we held that a unanimity instruction may be required where the defendant has different defenses to different episodes of assault. Kiser, 87 Wn. App. at 130.

Here, as in Kiser, Sefton and Lloyd were charged with assault of a child in the first degree in violation of RCW 9A.36.120(1)(b)(ii). Based on the testimony of the witnesses who observed the injuries to K.S.'s face, ear, forearms, and hands, the evidence showed the assaults took place in a short period of time between late February and March 2014. Witnesses observed the bruising and "nail marks" on K.S.'s ear and small round bruises on his forearms on February 26, 2014; saw K.S. come to school with red, burned hands in mid-March; and noticed bruises on K.S.'s face and his

---

[11] Emphasis in original.

red swollen hands on March 18 and again on 20. Neither Sefton nor Lloyd asserted different defenses to the different episodes of assault. We conclude a jury unanimity instruction was not necessary in this case and affirm the conviction of assault of a child in the first degree.

### 4. Criminal Mistreatment in the First Degree

Sefton asserts sufficient evidence does not support the alternative means of committing criminal mistreatment in the first degree. Sefton claims criminal mistreatment in the first degree is an alternative means crime as to the specific "basic necessities of life" that were withheld.[12] Sefton contends the trial court should have either instructed the jury it must unanimously agree to the means or given a special verdict form identifying the means relied on.

An alternative means crime is a crime that provides the " 'proscribed criminal conduct may be proved in a variety of ways.' " State v. Peterson, 168 Wn.2d 763, 769, 230 P.3d 588 (2010) (quoting State v. Smith, 159 Wn.2d 778, 784, 154 P.3d 873 (2007)). Where a crime may be committed in more than one way, there must be jury unanimity as to guilt for the crime charged. Kitchen, 110 Wn.2d at 410. As a general rule, alternative means crimes are set forth in a statute stating a single offense "under which are set forth more than one means by which the offense may be committed." Smith, 159 Wn.2d at 784.

Under RCW 9A.42.020(1), a person commits "criminal mistreatment in the first degree" by "withholding any of the basic necessities of life." RCW 9A.42.010(1) defines "basic necessities of life" as "food, water, shelter, clothing, and medically necessary

---

[12] RCW 9A.42.020.

42

health care, including but not limited to health-related treatment or activities, hygiene, oxygen, and medication." Washington courts have "resisted efforts to interpret statutory definitions as creating additional means, or means within a means, of committing an offense." State v. Nonog, 145 Wn. App. 802, 812, 187 P.3d 335 (2008); Smith, 159 Wn.2d at 785-86. Sefton's interpretation of the crime relies on the definition of "basic necessities of life" contained in the definitional statute, RCW 9A.42.010(1). But RCW 9A.42.020, which describes the offense of criminal mistreatment in the first degree, does not list the alternative basic necessities of life in the text or in numbered subsections. We conclude the different basic necessities of life listed in RCW 9A.42.010(1) are merely definitional and not alternative means of committing the crime. Neither a jury unanimity instruction nor a special verdict form were warranted.

Sefton cites Nonog and State v. Peterson, 174 Wn. App. 828, 301 P.3d 1060 (2013), to argue the definition of basic necessities of life identifies alternative means of committing criminal mistreatment. Nonog and Peterson are inapposite. In Nonog, we held interfering with the reporting of domestic violence under RCW 9A.36.150(1) is an alternative means crime. Nonog, 145 Wn. App. at 812. The statute identified three different ways of committing the crime that "are not merely descriptive or definitional of essential terms." Nonog, 145 Wn. App. at 812. We concluded the "variations are themselves essential terms." Nonog, 145 Wn. App. at 812. In Peterson, the court held the animal cruelty statute is an alternative means crime because the statute sets out three distinct ways of committing the crime that are essential elements rather than mere definitions of the crime. Peterson, 174 Wn. App. at 852. This case is distinguishable from Nonog and Peterson.

5. Prosecutorial Misconduct

Sefton asserts the prosecutor committed misconduct during closing argument and rebuttal. To prevail on a claim of prosecutorial misconduct, the defendant must show the prosecutor's argument was both improper and prejudicial. State v. Warren, 165 Wn.2d 17, 26, 195 P.3d 940 (2008). We review allegations of prosecutorial misconduct for an abuse of discretion. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014).

We review allegedly improper comments in the context of the entire closing argument, the issues presented, the evidence addressed, and the instructions given to the jury. State v. Russell, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994). The prosecutor "is entitled to make a fair response to the arguments of defense counsel" during rebuttal argument. State v. Gauthier, 189 Wn. App. 30, 37-38, 354 P.3d 900 (2015); State v. Gregory, 158 Wn.2d 759, 842, 147 P.3d 1201 (2006); Russell, 125 Wn.2d at 87. The defendant must show the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict. State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). Where the defendant does not object at trial, any error is waived unless the prosecutorial misconduct is so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. Emery, 174 Wn.2d at 760-61.

The prosecutor began closing argument by telling the jury:

As I said at the onset of this case, there are typically three parties to child abuse: The abused, the abuser, and the bystanders.
And true to form, there were plenty of bystanders in this case. But the time of reckoning is upon us, and none of us will be mere bystanders.
Nature in this case has failed. The instinct for parents to love and nurture their children has failed. The system designed to step in and step up in this circumstance has failed.

We will not fail. We will be swift and just and virtuous against what is before us in this shadow of humanity.

In rebuttal closing argument, the prosecutor returned to this theme. "How much our society values its children can be measured by how well they are treated, how well they are protected, and it is time to show [K.S.] and [R.L.] and [D.S.] that they are valued and that they will be protected." The defense did not object.

For the first time on appeal, Sefton argues the prosecutor committed misconduct by urging the jury to "send a message" and encouraging the jury to decide the case based on passion and prejudice.

A prosecutor may not urge the jury to convict a defendant to protect community values, preserve order, or deter criminal behavior. State v. Ramos, 164 Wn. App. 327, 338, 263 P.3d 1268 (2011); State v. Bautista-Caldera, 56 Wn. App. 186, 195, 783 P.2d 116 (1989). In Ramos, we held the prosecutor improperly suggested the jury should convict the defendant to end the drug problem in the area. Ramos, 164 Wn. App. at 337-38, 340-41. In Bautista-Caldera, the court held a prosecutor improperly asked the jury to send a message to all children of sex abuse that they will be believed. Bautista-Caldera, 56 Wn. App. at 194-95.

Here, the prosecutor addressed the many missed opportunities to help K.S. based on the evidence at trial. In particular, the numerous CPS reports in the months leading up to the arrest of Sefton and Lloyd, consistent with school nurse Sasser's testimony that she was frustrated with CPS's failure to take action to help K.S. In rebuttal, the prosecutor responded to Sefton's argument that Auburn School District personnel decided early on that Sefton and Lloyd were abusing K.S. even when there was no evidence of abuse. By drawing attention to the many missed opportunities to

protect the victims in this case, the prosecutor did not urge the jury to send a message to all abused children. Instead, the prosecutor reminded the jury to consider all the evidence and take its job seriously, in contrast to how CPS handled the case. We conclude Sefton cannot show misconduct "so flagrant and ill-intentioned that it cause[d] an enduring and resulting prejudice that could not have been neutralized by a curative instruction." State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997).[13]

In the alternative, Sefton asserts trial counsel provided ineffective assistance by not objecting to the argument. To combat hindsight, our scrutiny of defense counsel's failure to object is highly deferential. State v. Grier, 171 Wn.2d 17, 33-34, 246 P.3d 1260 (2011). To prevail, Sefton must show his attorney's performance fell below an objective standard of reasonableness and the result would have been different. Strickland, 466 U.S. at 687. Sefton cannot establish that his attorney's performance fell below an objective standard or that the result would have been different if his attorney objected.

### 6. Mental Health Evaluation and No-Contact Order

Sefton contends the sentencing court erred in ordering mental health evaluation and treatment without making the required statutory findings. Under RCW 9.94B.080, the court may order an offender to undergo a mental status evaluation if the court finds the defendant is likely "a mentally ill person as defined in RCW 71.24.025" and their mental status is "likely to have influenced the offense." As the State concedes, the trial court did not make the requisite findings. We accept the concession and remand. On

---

[13] As the State points out, even if the prosecutor's statements were improper, because the jury did not convict Sefton and Lloyd on all counts, it is highly unlikely the jury interpreted the prosecutor's statements to be an instruction to send a message to all children of abuse.

remand, the court shall determine whether to order a mental health evaluation and if so, enter findings as required by RCW 9.94B.080. State v. Shelton, 194 Wn. App. 660, 676, 378 P.3d 230 (2016).

Sefton contends the lifetime no-contact order with D.S. violates his fundamental right to parent. But during sentencing, the court said it would "reconsider" the no-contact order "at some point." The no-contact order expires on April 21, 2099. The State concedes it is unclear whether the sentencing court intended to impose a lifetime no-contact order between Sefton and D.S. We agree and remand to determine whether to impose a no-contact order with D.S. and if so, to enter specific findings on the scope and duration of the no-contact order.

LLOYD APPEAL

### 1. Sufficiency of the Evidence

Lloyd contends insufficient evidence supports the conviction for assault of a child in the first degree. Lloyd claims only Sefton inflicted injuries on K.S.

In reviewing a challenge to the sufficiency of the evidence, we view the evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Witherspoon, 180 Wn.2d 875, 883, 329 P.3d 888 (2014); State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A challenge to the sufficiency of the evidence admits the truth of the State's evidence. Witherspoon, 180 Wn.2d at 883. "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." Salinas, 119 Wn.2d at 201. We defer to the trier of fact on "issues of witness credibility." Witherspoon, 180 Wn.2d at 883.

The court instructed the jury that to convict Sefton and Lloyd of assault of a child in the first degree, the State must prove beyond a reasonable doubt:

> (1) That on or about October 1, 2013 through March 20, 2014, the defendant intentionally assaulted K.S. and caused substantial bodily harm;
> (2) That the defendant was eighteen years of age or older and K.S. was under the age of thirteen;
> (3) That the defendant had previously engaged in a pattern or practice of
> (a) assaulting K.S. which had resulted in bodily harm that was greater than transient physical pain or minor temporary marks; or
> (b) causing K.S. physical pain or agony that was equivalent to that produced by torture; and
> (4) That any of these acts occurred in the State of Washington.

Lloyd asserts she had no duty to protect K.S. from Sefton and there was no evidence that she acted as an accomplice. The State argues that viewing the evidence in the light most favorable to the State, the evidence supports the jury finding Lloyd was guilty of assault of K.S. in the first degree. We conclude sufficient evidence supports the conviction of Lloyd as a principal and as an accomplice.

Chinook school counselor Rodriguez testified that on February 26, 2014, K.S. had a large purple bruise on the top of his ear and small round bruises on his forearms. Rodriguez noticed the inside of K.S.'s ear "also had some diagonal slash marks that looked like fingernail marks, as if somebody had reached out and grabbed him by his ear." When Rodriguez asked K.S. what happened to his ear, K.S. said he did not remember. Rodriguez reported the ear injury to CPS that day.

On February 28, CPS social worker Gonzalez took photographs of K.S.'s injuries and sent them to child abuse pediatrician Dr. Weister through "MedCon," the statewide medical consultant program. Dr. Weister reviewed the photographs that day. The photographs showed a bruise in the inner part of K.S.'s left ear and bruising on the back

of the ear. These photographs were admitted at trial. Dr. Weister testified the ear injuries were "very worrisome for inflicted trauma" because the injury was not consistent with K.S.'s explanation that the injury was from sleeping on a carpeted floor. Dr. Weister stated the "abundant literature and clinical experience" shows ear injuries on children are often inflicted, not accidental. Dr. Weister testified the fact that there was bruising on both sides of the ear indicated a "significant trauma" caused by "a significant blow." Dr. Weister recommended K.S. be taken to Seattle Children's Hospital immediately.

CPS social worker Gonzalez instructed Sefton and Lloyd to bring K.S. to Seattle Children's Hospital but they did not comply. Seattle Children's Hospital called CPS. When CPS social worker Jackson asked K.S. how his ear was injured, K.S. stated, "[T]he week before the family was on vacation, so he was sleeping on the floor." On March 1, Jackson asked Sefton and Lloyd to take K.S. to Seattle Children's Hospital. They refused. Instead, Sefton and Lloyd took K.S. to Auburn Medical Center, where Jackson interviewed K.S.

Dr. Weister reviewed the March 1 records of K.S.'s treatment at Auburn Medical Center. Lloyd told the doctor that K.S. injured his ear by sleeping on the floor. Dr. Weister testified, "There's otherwise no history, which means no other information was given about the injury." Dr. Weister testified Lloyd's explanation "was not consistent with the injury," specifically, "the information that was given about falling asleep on the floor was not consistent with the injury that he had."

Sefton and Lloyd brought K.S. to Seattle Children's Hospital on March 7. Sefton and Lloyd said K.S. was "aggressive" and "injuring himself." During that visit, K.S. said

the ear injury occurred when his family was staying in a hotel room in Oregon and he was on the floor. "Then he said he hit himself in the ear repeatedly in order to stay awake so that he could watch the movie that his father was watching."

Dr. Weister reviewed the records of the March 7 visit to Seattle Children's Hospital. Dr. Weister testified K.S.'s explanation that he hit himself in the ear to stay awake was "highly concerning for and consistent with inflicted trauma." Dr. Weister testified the "several stories about how [the ear injury] happened"—that he "can't remember how it happened, or says he did it himself, or repeats history that's given by family members when it doesn't make mechanical sense"—made her "worried even more that this is non-accidental, that this would be inflicted."

On March 20, Seattle Children's Hospital emergency department pediatrician Dr. Kaplan examined K.S. The State introduced a series of photographs of K.S. taken during the visit. Dr. Kaplan explained the "redness and swelling of the ear" shown in the photographs is "a very unusual place to have any sort of accidental injury." Dr. Kaplan testified any ear injury is "suspicious" and the only reason to have bruising on the ear is "if someone grabbed your ear and squeezed it." Dr. Kaplan said the ear bruising present at the March 7 hospital visit was not caused by sleeping on the floor and it would be difficult to self-inflict trauma on that part of the body.

R.L. testified that Lloyd "would hold [K.S.] by the ear and walk him around holding his ear" as punishment. R.L. said K.S. would "be screaming" when Lloyd held his ear because "it hurt him because she was pulling on it."

The evidence about K.S.'s ear injury establishes that Lloyd, not just Sefton, assaulted K.S. intentionally and caused substantial bodily harm over a prolonged period

of time. We conclude sufficient evidence supports Lloyd's conviction for assault of a child in the first degree.

### 2. Double Jeopardy

Lloyd asserts the convictions for assault of a child in the first degree and criminal mistreatment in the first degree violate double jeopardy. Lloyd claims the State relied on the same evidence to prove both crimes.

We review claims of double jeopardy de novo. State v. Smith, 177 Wn.2d 533, 545, 303 P.3d 1047 (2013). The United States Constitution and the Washington State Constitution prohibit the State from twice putting a defendant in jeopardy for the same offense. U.S. Const. amend. V ("No person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb."); Wash. Const. art. I, § 9 ("No person shall . . . be twice put in jeopardy for the same offense."); State v. Fuller, 185 Wn.2d 30, 33, 367 P.3d 1057 (2016). Courts may not impose multiple convictions for the same offense without violating double jeopardy. State v. Freeman, 153 Wn.2d 765, 770, 108 P.3d 753 (2005).

In analyzing a double jeopardy claim, we begin with the statutory language to determine whether the statutes expressly permit punishment for the same act or transaction. State v. Hughes, 166 Wn.2d 675, 681, 212 P.3d 558 (2009). If the statutes do not address multiple punishments for the same act, we apply the "same evidence" test. Hughes, 166 Wn.2d at 681-82. Under the same evidence test, "the defendant's double jeopardy rights are violated if he or she is convicted of offenses that are identical both in fact and in law." State v. Calle, 125 Wn.2d 769, 777, 888 P.2d 155 (1995).

However, if each offense as charged includes an element not included in the other, the offenses are different and multiple convictions can stand. Calle, 125 Wn.2d at 777.

To prove criminal mistreatment in the first degree, the State must prove that the defendant was the parent or otherwise entrusted with the care of the victim and that the defendant withheld "the basic necessities of life." RCW 9A.42.020. Assault of a child in the first degree requires no such relationship between the defendant and the victim. Conversely, assault of a child in the first degree requires the State to prove the defendant is at least 18 years old and the victim is under 13 years old and the defendant committed an assault, engaged in a pattern or practice of assault, or caused physical pain akin to torture. RCW 9A.36.120(1)(b)(ii). Because each crime contains an element the other does not, we presume the crimes are not the same offense. Freeman, 153 Wn.2d at 772.

Further, the record does not support Lloyd's claim that the State relied on the same evidence to prove the two crimes. Freeman, 153 Wn.2d at 777 (the mere fact the same conduct is used to prove both crimes is not dispositive under the same evidence test). The evidence showed a pattern and practice of causing physical pain and starvation. Because the crimes are not the same in law or fact, we conclude the convictions do not violate double jeopardy.

### 3. Vagueness Challenge: Torture

Lloyd argues that as applied, the term "torture" as used in the statute that defines the crime of assault of a child in the first degree is unconstitutionally vague. See RCW 9A.36.120(1)(b)(ii). We review whether a statute is unconstitutionally vague de novo as a question of constitutional law. State v. Watson, 160 Wn.2d 1, 5, 154 P.3d 909 (2007).

The Fifth Amendment to the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." The vagueness doctrine ensures laws provide notice and clear standards to prevent arbitrary enforcement. Johnson v. United States, ___ U.S. ___, 135 S. Ct. 2551, 2556, 192 L. Ed. 2d 569 (2015); In re Det. of LaBelle, 107 Wn.2d 196, 201, 728 P.2d 138 (1986). "The purpose of this doctrine is to 'provide fair notice to citizens as to what conduct is proscribed and to protect against arbitrary enforcement of the laws.'" In re Det. of M.W., 185 Wn.2d 633, 661, 374 P.3d 1123 (2016) (quoting City of Seattle v. Eze, 111 Wn.2d 22, 26, 759 P.2d 366 (1988)).

The party challenging a law as void for vagueness bears the burden of proving it is unconstitutional. M.W., 185 Wn.2d at 661. We presume the statute is constitutional. State v. Bahl, 164 Wn.2d 739, 753, 193 P.3d 678 (2008); Watson, 160 Wn.2d at 11. A statute is unconstitutionally vague if either it does not define the criminal offense with sufficient definiteness that an ordinary person would understand what conduct is proscribed or it does not provide ascertainable standards of guilt to protect against arbitrary enforcement. Watson, 160 Wn.2d at 6.

We previously rejected a void for vagueness challenge to the term "torture." State v. Brown, 60 Wn. App. 60, 66, 802 P.2d 803 (1990); State v. Russell, 69 Wn. App. 237, 248, 848 P.2d 743 (1993). In Brown, the defendant was charged with assault in the second degree under the "torture" prong and argued the term was unconstitutionally vague. Brown, 60 Wn. App. at 64-65. While definitions of the term may vary slightly, we concluded the word "torture" gives notice "with a reasonable degree of certainty" as to what conduct is prohibited. Brown, 60 Wn. App. at 66.

In Russell, the defendant was convicted of homicide of his son by abuse. Russell, 69 Wn. App. at 241. The homicide by abuse statute requires the State to prove the defendant previously engaged in a pattern or practice of assault or torture of the victim, which Russell argued was unconstitutionally vague. Russell, 69 Wn. App. at 244-45. We disagreed, noting the term "torture" is commonly understood and provides notice as to what is forbidden. Russell, 69 Wn. App. at 248.

We adhere to Brown and Russell and reject Lloyd's void for vagueness challenge. The term "torture" gives notice as to what conduct is prohibited. The evidence at trial showed Sefton and Lloyd deprived K.S. of sleep, isolated him from the family, and withheld food. Without objection, Dr. Weister described the difference between child abuse and child torture. Dr. Weister testified Sefton and Lloyd's actions met almost every marker for child torture. As applied here, the term "torture" is not unconstitutionally vague.

4. Vagueness Challenge: Deliberate Cruelty and Particularly Vulnerable Victim Aggravating Factors

Lloyd argues the aggravating factors "deliberate cruelty" and "particularly vulnerable" victim are unconstitutionally vague. See RCW 9.94A.535(3)(a), (b). RCW 9.94A.535(3) lists "aggravating circumstances" that can support a departure from the sentencing guidelines if the "facts supporting aggravating circumstances" can be "proved to a jury beyond a reasonable doubt." RCW 9.94A.537(3). "Aggravating Circumstances" include the defendant's conduct "manifested deliberate cruelty to the victim" and the defendant knew or should have known the victim "was particularly vulnerable." RCW 9.94A.535(3)(a), (b).

The Washington Supreme Court in State v. Baldwin, 150 Wn.2d 448, 459, 78 P.3d 1005 (2003), rejected a void for vagueness challenge to sentencing guidelines statutes because "the due process considerations that underlie the void-for-vagueness doctrine have no application in the context of sentencing guidelines." Sentencing guidelines do not inform the public of the penalties attached to criminal conduct or allow for arbitrary arrest and prosecution. Baldwin, 150 Wn.2d at 459.

Contrary to Lloyd's assertion that Baldwin has been overruled, the United States Supreme Court recently reaffirmed that the sentencing guidelines are not subject to a vagueness challenge because "they merely guide the exercise of a court's discretion in choosing an appropriate sentence within the statutory range." Beckles v. United States, ___ U.S. ___, 137 S. Ct. 886, 892, 197 L. Ed. 2d 145 (2017).

Because the aggravating factors merely guide the sentencing court's decision to impose an exceptional sentence, we reject Lloyd's void for vagueness challenge.

5. Exceptional Sentence: Particularly Vulnerable Victim

Lloyd argues the court erred by imposing an exceptional sentence based on finding that K.S. was a particularly vulnerable victim. Lloyd contends the legislature necessarily considered the age of the victim in determining the standard-range sentence for assault of a child in the first degree and criminal mistreatment in the first degree.

An element of the charged offense may not be used to justify an exceptional sentence. State v. Ferguson, 142 Wn.2d 631, 648, 15 P.3d 1271 (2001). An exceptional sentence may not be imposed based on factors inherent to the offense for which the defendant is convicted. State v. Thomas, 138 Wn.2d 630, 636, 980 P.2d

1275 (1999). Under RCW 9.94A.535(3)(b), one of the aggravating factors is "[t]he defendant knew or should have known that the victim of the current offense was particularly vulnerable or incapable of resistance." The State must prove (1) the defendant knew or should have known (2) of the victim's particular vulnerability and (3) that vulnerability was a substantial factor in committing the crime. State v. Suleiman, 158 Wn.2d 280, 291-92, 143 P.3d 795 (2006).

Contrary to Lloyd's argument, courts have upheld an exceptional sentence based on a particularly young victim even when the statute included an age element. See, e.g., State v. Fisher, 108 Wn.2d 419, 421, 423-24, 739 P.2d 683 (1987) (considering age of the 5-and-a-half-year-old victim as an aggravating factor where crime is indecent liberties of a child younger than 14); State v. Garibay, 67 Wn. App. 773, 776, 778-79, 841 P.2d 49 (1992) (considering age of the 4-year-old victim as an aggravating factor where crime is rape of a child younger than 12).

Further, as previously noted, the crimes of assault of a child and criminal mistreatment include a wide age-range. Assault of a child in the first degree requires the victim to be under 13 years old, while criminal mistreatment in the first degree requires the victim to be "a child or dependent person." RCW 9A.36.120(1); RCW 9A.42.020(1). K.S. was only 6 years old when Lloyd and Sefton committed the crimes of assault of a child and criminal mistreatment in the first degree. In addition, their actions toward K.S. made him particularly vulnerable. The deprivation of sleep and food made K.S. chronically tired and weak. The evidence supports finding K.S. was a particularly vulnerable victim.

## 6. Exceptional Sentence: Domestic Violence

Lloyd asserts the sentencing court erred in relying on the aggravating factor that K.S. was a member of her family or household to impose an exceptional sentence. Lloyd argues she and K.S. were not "family or household members" as defined by RCW 10.99.020(3). RCW 10.99.020(3) defines "family or household members" in part as "persons who have a biological or legal parent-child relationship, including stepparents and stepchildren and grandparents and grandchildren." The State concedes the court could not rely on the domestic violence aggravating factor to impose an exceptional sentence as to Lloyd. We accept the concession as well taken.

But we may uphold an exceptional sentence even when we overturn one of the aggravating factors if the trial court would have imposed the same sentence based on other aggravating factors. State v. Jackson, 150 Wn.2d 251, 276, 76 P.3d 217 (2003). Here, the court imposed a concurrent exceptional sentence of 240 months on assault of a child in the first degree and 120 months on criminal mistreatment in the first degree based on the particularly vulnerable victim, deliberate cruelty, and domestic violence aggravating factors. The court concluded, "Each one of these aggravating circumstances is a substantial and compelling reason, standing alone, that is sufficient justification for the length of the exceptional sentence imposed." We uphold the exceptional sentence.

## 7. Same Criminal Conduct

Lloyd asserts she received ineffective assistance of counsel because her attorney did not argue assault of a child in the first degree and criminal mistreatment in the first degree constitute the same criminal conduct for purposes of sentencing.

In calculating the offender score, the court counts current and prior convictions. RCW 9.94A.589(1)(a). The offender score for a current offense includes all other current offenses unless "the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime." RCW 9.94A.589(1)(a). "Same criminal conduct" means "two or more crimes that (1) require the same criminal intent, (2) are committed at the same time and place, and (3) involve the same victim." State v. Vike, 125 Wn.2d 407, 410, 885 P.2d 824 (1994); RCW 9.94A.589(1)(a). In this context, "intent" is the objective criminal purpose in committing the crime, although the Washington Supreme Court has also looked to statutes to determine criminal intent. State v. Rattana Keo Phuong, 174 Wn. App. 494, 546, 299 P.3d 37 (2013); see State v. Chenoweth, 185 Wn.2d 218, 222-23, 370 P.3d 6 (2016) (court examined rape of a child in the third degree statute and incest statute to reject argument that the "two crimes involve separate intent" because "[t]he intent to have sex with someone related to you differs from the intent to have sex with a child"). Courts will also look at whether one crime furthered another as part of this analysis. State v. Graciano, 176 Wn.2d 531, 540, 295 P.3d 219 (2013).

Lloyd contends her intent in committing both assault of a child in the first degree and criminal mistreatment in the first degree was the same—a misguided attempt at parenting. The record does not support her argument. The evidence showed Lloyd and Sefton committed acts of physical violence against K.S., such as pulling him by his ear. The evidence also showed Lloyd and Sefton withheld food and sleep from K.S. over a long period of time because they disliked K.S. and believed he was "messy" and a "bad kid." Further, the two crimes involve separate criminal intent. The intent to cause

substantial bodily harm as part of a pattern or practice of assaulting K.S. to cause great physical pain or agony equivalent to torture, RCW 9A.36.120(1)(b)(ii), differs from the intent to cause great bodily harm by withholding the basic necessities of life, RCW 9A.42.020(1). We conclude trial counsel did not provide ineffective assistance by failing to argue same criminal conduct.

<u>Appellate Costs</u>

Sefton and Lloyd ask us to deny appellate costs. Appellate costs are generally awarded to the substantially prevailing party on review. RAP 14.2. Where, as here, a trial court makes a finding of indigency, that finding remains throughout review "unless the commissioner or clerk determines by a preponderance of the evidence that the offender's financial circumstances have significantly improved since the last determination of indigency." RAP 14.2. Under RAP 14.2, if the State has evidence indicating that Sefton or Lloyd's financial circumstances have significantly improved since the trial court's finding, it may file a motion for costs with the commissioner. <u>State v. St. Clare</u>, 198 Wn. App. 371, 382, 393 P.3d 836 (2017).

We affirm the jury convictions of assault of a child in the first degree and criminal mistreatment in the first degree. We remand to address whether to order a mental

health evaluation as a condition of community custody and whether to impose a no-contact order with D.S. and if so, enter findings.

WE CONCUR: